674 So.2d 1318 (1993)
Kenneth James JACKSON
v.
STATE.
CR-91-820.
Court of Criminal Appeals of Alabama.
September 30, 1993.
Rehearing Denied March 4, 1994.
*1322 Connie Walter Parson, Birmingham, and Michael O'Connor and Kathryn V. Stanley, Montgomery, for appellant.
James H. Evans, Atty. Gen., and Sandra Stewart and Andy Poole, Asst. Attys. Gen., for appellee.
McMILLAN, Judge.
The appellant, Kenneth James Jackson, was convicted of the offense of murder committed during the course of a robbery. § 13A-5-40(a)(2), Code of Alabama 1975. Following the initial sentencing hearing, the jury returned an advisory verdict recommending a sentence of death by electrocution, by a vote of 11 to 1. At the subsequent sentencing hearing, the trial court sentenced the appellant to death by electrocution.
The record indicates the following. The victim was an admitted homosexual who had worked at the emergency room of Children's Hospital in Birmingham for many years. On the day of the offense, the victim had been socializing with friends and drinking alcohol. Some time just prior to midnight they decided to go to a local night club, located near the victim's home in the Pratt City area of Birmingham. The appellant, who had met the victim on occasion through mutual friends, arrived at the club just after midnight. He was dropped off by a friend with whom he had worked that evening as a disc jockey at another local bar. While the appellant stated that he was not a homosexual himself, he admitted that he had lived with a number of homosexuals from time to time, several of whom were friends of the victim. Witnesses at the club testified that the victim and the appellant sat at the bar at the same time, two seats apart, without talking, other than perhaps a few words. The witnesses all testified that the appellant had a bandage around his left forearm. This bandage was later determined to have been covering a wound that resulted from a knife fight two nights earlier. There was a discrepancy in the evidence as to whether the appellant and the victim left at the same time or approximately 10 to 15 minutes apart; however, the appellant left the bar at approximately 3:15 a.m. There was testimony from a State's witness that she observed the appellant waiting at the passenger's side of the victim's car for the victim to unlock the door. A neighbor of the victim testified that she was awakened at 4:25 a.m. by the smell of smoke and that after she determined there was no electrical problem at her home, she again went to sleep. She said that she awoke again at approximately 4:50 to 5:00 to find smoke in her house. She said she looked outside and found that the victim's house was on fire, called the operator, and reported the fire. The fire department arrived 12 to 15 minutes later and found the house engulfed in flames. Subsequent investigation by the state fire marshal's office and the Birmingham Fire Department revealed that the fire was caused by arson, although no evidence of accelerants was found. An expert in fires testified that based on the existence of "V-shape" patterns on the walls and the fact that the flames had burned through the roof, he was of the opinion that the fire originated at a low point, probably close to a couch in the living room, and had been burning for approximately one to one and one-half hours. The firemen discovered a body in the living room, lying face down, nude, with its arms and legs spread apart. The body was burned beyond recognition. Although the identity of the owner of the house was ascertained, the body was identified some time after the fire through dental records.
A State's witness testified that he had been visiting a friend who lived in "the Brick Yard," a housing project located close to the victim's house, and that he left his friend's house between 4:00 and 4:30 a.m. This witness acknowledged that he had smoked crack cocaine earlier in the evening and that he had been smoking marijuana while visiting his friend. He began walking to locate someone to give him a ride home. He testified that he observed a car speeding through the project, and making quick stops, apparently looking for someone. He testified that, after this car circled by him for the third time, it stopped, and a man, subsequently identified by the witness as the appellant, got out. He asked the witness if he had seen "a dark-skinned chick walk up the alley." The witness testified that the man was not wearing a shirt, and that there was blood smeared *1323 across his chest. He also described the man as having a bandage around one of his arms and said that the bandage had blood on it. He testified that the man appeared to be "hyped" and that he was actively looking for a particular girl. The appellant stated that he was "going to kill the bitch. She had run off with his money." A friend of the witness indicated that he had seen the girl go into a particular house, in which narcotics were commonly sold. As the appellant and the witness approached the house, the appellant told him, "I just shot a nigger." The witness asked if the appellant had killed him, to which the appellant responded affirmatively and told the witness, "Don't nobody know that but you." The witness responded, "There still don't nobody know it but me and you, and I ain't sayin' nothing' else about it." Just before they entered the house, the appellant told the witness he was going back to his car to get his gun and, when the appellant returned, he had put his shirt on and he purported to have a gun. A woman at the house told them that the girl whom the appellant sought had gone out the back of the house. When they found the girl, she had a rock of cocaine, which she had apparently bought for the appellant. The appellant agreed to give the witness a ride home and the appellant, the witness, and the girl all got into the appellant's car. The appellant sped out of the project and was observed by a police officer. The officer testified that he observed the appellant speeding from the project at approximately 4:40 a.m. The officer followed the appellant. The State's witness testified that the appellant indicated that he was going to attempt to outrun the police. The witness said he told the appellant that he recognized the officer and asked him to pull over, because the police vehicle had turned on its lights and siren. The appellant stopped the vehicle, but told the witness to let him know when the officer got out of the car, and said that he was going to "pull off." The witness then jumped out of the car and approached the police officer, followed closely by the girl. Approximately eight or nine police vehicles had joined in the pursuit and the officers had drawn guns on the appellant. The State's witness told the police officer, whom he knew and who had initiated the chase, that he did not know the appellant, but that the appellant had told him that he had just shot someone. The officer testified that, upon apprehending the appellant, he detected a strong odor of alcohol and noted that the appellant's speech was slurred. He testified that he believed the appellant was intoxicated. The appellant was patted down for weapons and subsequently failed a field sobriety test. He was then arrested for driving under the influence.
Subsequently, the car driven by the appellant when he was arrested was determined to have belonged to the victim. The victim's wallet was found beneath the seat on the passenger side of the vehicle. His checkbook and one of his bank slips was found on the appellant's person. The bank slip, which was in an envelope, however, was not found until the appellant had been transported for arrest pursuant to the robbery and murder. The appellant eventually gave two statements concerning the murder, in which he implicated a man named Robert, Jr. There was testimony at trial that the appellant had previously been arrested for an unrelated burglary and that he had told the police that a Robert, Jr., had committed the offense. Investigation of that earlier burglary revealed that no person by that name could be located, nor could any further information about him be obtained.
The coroner testified at trial that he was able to ascertain that the victim had been beaten about the face and chest, and that there were bruises in the pelvic area, which might have been caused by kicking. He testified that, because there was very little muscle tissue remaining, there were large areas of the body that he was unable to examine to determine whether there had been a more extensive beating. He was able to conclude, however, that the victim died from manual strangulation, due to some finger-like marks found around the area of the victim's esophagus, as well as the condition of the hyoid bone. Further, the patterns of the bloodstains found on the appellant's jeans, tennis shoes, and shirt were determined to have been caused by both smearing and spatter. The testimony indicated that a spatter pattern would be consistent with injury from *1324 impact with a bloody wound or an open bloody area, as well as from walking through, or slapping, large amounts of blood. Where the bloodstains were large enough to be analyzed, they were determined to be consistent with that of the victim. Semen was also found on the appellant's boxer shorts.
At trial, the appellant changed his account of the offense, testifying that Robert, Jr., picked him up at the club in the victim's car, and that they went to the Ice House to buy beer. He said that they then drove to the victim's house and carried the beer inside and that the victim was there with a man named Tony Shuford. The appellant testified that Robert, Jr., soon left, but that he remained. He testified that, after some casual conversation, the victim began to approach him about having sex. The appellant became agitated because the victim had asked him in front of Tony Shuford. According to the appellant, the appellant and the victim then went to another room, where a fight ensued during which the appellant hit the victim in the eye three times. The appellant testified that the victim hit him in the jaw. The appellant testified that immediately following the fight, the two apologized and were back on good terms. After they talked a while, the appellant testified that the victim stated that he would pay the appellant for the beer and then he would like the appellant to leave. The appellant agreed, whereupon the victim walked back to the room where Tony Shuford and the victim's wallet were located. The victim discovered that his money was missing from his wallet and he accused Tony Shuford of stealing it. The appellant testified that a fight broke out between the victim and Shuford, during which Tony Shuford beat the victim and subsequently strangled him with a necktie. The appellant testified that he watched the fight. The appellant testified that after the fight, he knelt down in the blood beside the victim to determine whether he was alive. Upon determining that he appeared to be dead, the appellant testified that he quickly left the scene in the victim's automobile to drive to a girlfriend's house to telephone the police. He testified that, after he drove around the corner from the victim's home, he saw Tony Shuford walking down the street, and Shuford flagged him down. He picked him up and drove him to the project. He testified that he had not informed anyone about Shuford's role in the offense until the time of trial because, he said, Shuford had threatened members of his family, and the appellant feared for their safety. The appellant testified that Shuford had been released from West Jefferson Correctional Facility shortly before the offense had been committed.
On rebuttal, the State introduced evidence that it had run a National Crime Information Computer check on Anthony Shuford, and all variations of that name, and determined that there was an Anthony Shuford who had lived in the area and who had been incarcerated; however, that individual was imprisoned at the time of the offense.

I
The appellant argues that the jury was improperly instructed by the trial court that it was not to make the ultimate determination as to whether the appellant's statements were voluntary. The appellant cites Ex parte Singleton, 465 So.2d 443 (Ala.1985), and Bush v. State, 523 So.2d 538 (Ala.Cr. App.1988), in support of his argument.
The record indicates that the trial court's oral charge to the jury prior to the attorneys' closing arguments included his instructions concerning the appellant's statements. The trial court charged the jury:
"I should probably tell you, before the lawyers talk to you and be the first to tell you before we get to the offensesI don't remember those exhibit numbersyou heard through the taping business at the jury rail, some statements, Detective Quinn and Detective Pressley talked to the defendant, you recall, and made statements that were played in front of the jury. You will have the transcripts of those statements in the jury room. You won't have the cassette tapes, but I should say to you that with regard to the statements reflected in these exhibits, whatever they are, you may consider all of the facts and circumstances surrounding the taking of the statement in determining weight *1325 and credibility that you give to the statements. You are exercising your exclusive prerogative in determining the credibility of the evidence or the weight to which this particular evidence we are talking about is properly entitled. You may consider the circumstances under which the statements were obtained, including the situation and mutual relations of the parties.
"While I determine the voluntariness of the statement, you people determine the weight or credibility of these statements and may disregard the statement which you find to be unworthy of belief or if you should entertain a reasonable doubt as to its truthfulness."
The appellant never objected as to this instruction; therefore, we must review this issue to the plain error standard, that is, whether the error "has or probably has adversely affected the substantial right of the appellant." Rule 45A, A.R.App.P.
The record in the present case indicates that the trial court's instruction to the jury did not constitute prejudicial error and, therefore, did not rise to the level of plain error.
In Ex parte Singleton, 465 So.2d 443, 446 (Ala.1985), the Alabama Supreme Court addressed this issue, stating:
"It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible. Clifton v. United States, 371 F.2d 354 (D.C.Cir.1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967); United States v. Inman, 352 F.2d 954 (4th Cir.1965). In the case at hand, however, the trial judge made it clear to the jury that they were to ultimately determine whether the confession was voluntary. We agree, therefore, with the Court of Criminal Appeals that there was no prejudicial error, since the comments of the trial judge `did not imply that the jury should accept and believe appellant's confession based on the trial court's ruling that the statement was voluntary.'
". . . .
"Correctly stated, whether a confession was voluntary rests initially with the trial court; once the trial court makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight and credibility to be given the confession. Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976)."
(Emphasis original.)
This court has previously addressed this issue in a similar situation where the trial court orally instructed the jury that, while the trial court determines the voluntariness of a defendant's statement, the jury has the exclusive prerogative of determining the credibility of the evidence or the weight to be accorded the evidence, so that the jury may disregard any of the statement that it considers to be unworthy of belief. Clark v. State, 621 So.2d 309 (Ala.Cr.App.1992). See also Aultman v. State, 621 So.2d 353 (Ala.Cr.App. 1992) (no prejudicial error occurred where the trial court instructed the jury that it had found the confession to be voluntary, because the court also instructed the jury that it was to determine how much weight, if any, to give the confession). In Clark v. State, 621 So.2d at 325, this court held:
"In the present case, as in Ex parte Singleton, the trial court's charge, when read as a whole, did not indicate that the jury should believe the appellant's confession because the trial court had determined it to be voluntary; nor did it indicate that the jury had no role in determining its voluntariness. Rather, the trial court's instructions informed the jury of its role in determining what weight should be given the confession."
Similarly, in giving this charge the trial court properly instructed the jury as to its role in considering the appellant's statements, and the substantial right of the appellant was not adversely affected, and the error was not "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Bush v. State, 523 So.2d 538, 560 (Ala.Cr.App.1988), quoting Ex parte Womack, 435 So.2d 766, *1326 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).

II
The appellant argues that his pretrial statements were involuntary and, therefore, improperly admitted, because, he says, he was intoxicated when he gave the first statement, he had not slept the entire night before this first statement was taken, and the handcuffs binding him while he made his statement were uncomfortably tight. The appellant in this case gave two pretrial statements. In both statements the appellant denied participation in the offense, and although the circumstances of his accounts varied between the two statements, he implicated Robert, Jr., as the perpetrator in both renditions. The appellant's first statement was taken at approximately 9:00 a.m. on the same day of his arrest. His second statement was taken three days later.
As to the appellant's first claim that his first statement was involuntary because, he says, he was intoxicated when it was taken, the evidence is clear that the appellant had been drinking at the club and was subsequently arrested for driving under the influence. There was testimony by one of the interrogating officers that the appellant's eyes were bloodshot and that he appeared fatigued, because he was slumped over in his chair, but none of the officers who were present when the appellant was questioned believed that he appeared to be under the influence. Each officer testified that he believed the appellant appeared to be alert and coherent.
"`"[U]nless intoxication, in and of itself, so impairs the defendant's mind that he is `unconscious of the meaning of his words,' the fact the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession." Carr v. State, 545 So.2d 820, 824 (Ala.Cr.App.1989). "The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility and evidence of the confession but may affect its weight and credibility." Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala.1989).'
"White v. State, [Ms. 8 Div. 473, August 24, 1990] [587 So.2d 1218] (Ala.Cr.App.1990)."
State v. Austin, 596 So.2d 598, 601 (Ala.Cr. App.1991). See also Rheuark v. State, 601 So.2d 135, 138-39 (Ala.Cr.App.1992).
"Indeed there was no evidence presented during the course of the trial that showed that the appellant was so intoxicated that he did not know what he was doing. In order for a confession to be inadmissible based on the appellant's intoxication, the `"mind of the appellant must be substantially impaired when the confession was made."' Mann v. State, 581 So.2d 22 (Ala. Cr.App.1991), quoting Cross v. State, 536 So.2d 155 (Ala.Cr.App.1988). See also Hubbard [v. State, 500 So.2d 1204 (Ala.Cr. App.), aff'd, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940 [107 S.Ct. 1591, 94 L.Ed.2d 780] (1987)]; McCammon v. State, 499 So.2d 811 (Ala.Cr.App.1986); Moore v. State, 488 So.2d 27 (Ala.Cr.App. 1986); Palmer v. State, 401 So.2d 266 (Ala. Cr.App.), writ denied, 401 So.2d 270 (Ala. 1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). `Where ample evidence ... exists from which the trial judge could conclude that the appellant was not intoxicated to the extent of mania, the admission of a confession for a jury's consideration is not an abuse of discretion.' Hubbard, 500 So.2d [at] 1218. The trial court's ruling was not `manifestly wrong.'"
Fuller v. State, 620 So.2d 669, 672 (Ala.Cr. App.1991), affirmed, 620 So.2d 675 (Ala.1993).
Furthermore, the appellant's claim of intoxication, without evidence that it had reached the stage of mania, is simply a matter to be considered by the jury in its determination of the weight and credibility to be accorded the statement. See White v. State, 587 So.2d 1218, 1227-28 (Ala.Cr.App.1990), affirmed, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).
As to the appellant's claim that his first statement was involuntary because, he says, the handcuffs were too tight, one of the officers present at the time of the statement *1327 testified that when the appellant complained that the handcuffs were too tight, the officer loosened the cuffs. "The fact that the officers had placed handcuffs upon the appellant at the time cannot be deemed to have affected the voluntary character of the statements." Dixon v. State, 38 Ala.App. 395, 85 So.2d 156, 158 (1956).
The appellant's next claims that his first statement was involuntary because, he says, he had not slept since the previous night, and the officers continued to interrogate him, despite what he describes as his state of sleep deprivation. The record indicates that there was testimony from the officers that the appellant appeared sleepy or fatigued, and there were statements made by the appellant at the time indicating that he was tired; however, the appellant never requested that the questioning stop because he was sleepy. When asked by the officers at the close of the statement whether they had hurt him in any way, the appellant responded, "Yes, y'all not letting me go to sleep, man. I'm tired, man. I was up all f_______ night...." However, the record indicates that the appellant was not apprehended until approximately 5:00 a.m. and that he had apparently planned on using the crack cocaine at that time with the girl from the projects. The officers testified that he appeared alert and this condition of fatigue is only a factor to be considered by the jury.
This claim is also to be considered by the jury in determining the credibility and weight to accord the statement under the totality of the circumstances. This court has found that where a defendant alleged that his statement was involuntary because, among other reasons, he was deprived of food and drink and "was in poor condition physically due to lack of sleep and the consumption of alcohol and drugs," this court found that upon a consideration of the totality of the circumstances, the appellant's statement was voluntary. Callahan v. State, 557 So.2d 1292, 1298-99 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala.1989). Furthermore, the Alabama Supreme Court refused to accept as a "coercive factor" the fact that a juvenile defendant was not questioned until a late hour. Ex parte Smith, 611 So.2d 1023 (Ala. 1992). In Whittle v. State, 518 So.2d 793, 796 (Ala.Cr.App.1987), the defendant argued that his confession was inadmissible because earlier on the day that he gave his statement he had taken a number of sleeping pills and had been drinking heavily. This court applied the principles set out in Williams v. State, 461 So.2d 834 (Ala.Cr.App.1983), reversed on other grounds, 461 So.2d 852 (Ala.1984), and in Musgrove v. State, 519 So.2d 565 (Ala.Cr. App.), affirmed, 519 So.2d 586 (Ala.1986), to determine whether the appellant's confession had been properly admitted. Those principles are set out as follows:
"`"(1) The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) `The admissibility of confessions is for the court, their credibility is for the jury.' Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. `(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala.1977), and cases cited therein. `Review of the court's action is limited to determining whether its finding was clearly erroneous.' United States v. Greer, 566 F.2d 472, 473 (5th Cir.1978)."'"
Whittle v. State, 518 So.2d at 796, quoting Musgrove v. State, 519 So.2d at 576.
*1328 Applying these standards for appellate review, we conclude that there is no indication that the trial judge's determination that the appellant's statements were admissible was clearly erroneous. Under the totality of the circumstances, it is clear that the appellant's statements were voluntarily given, after he was properly informed of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1986).

III
The appellant argues that the trial court's failure to instruct the jury on the lesser included offenses of murder, manslaughter, and reckless murder violated his due process rights. The record indicates that the trial court instructed the jury on the offenses of capital murder, specifically intentional murder committed during a robbery, as well as the lesser included offenses of felony murder, robbery in the first degree, and theft in the first degree.
The record indicates that the appellant did not object at trial to the court's failure to instruct the jury on these offenses. "While this failure does not preclude our review in capital cases, it does weigh against any claim of prejudice. Bui v. State, 551 So.2d 1094 (Ala.Crim.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991)." Dill v. State, 600 So.2d 343, 360 (Ala.Cr.App.1991), affirmed, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). The record indicates that the only offenses that could be supported by any reasonable theory of the State's evidence would be the offense of capital murder or the offense of felony murder. The evidence presented by the appellant would support only theft of the automobile or a finding of not guilty.
The appellant's original statement indicated someone named Robert, Jr., picked him up in the victim's car. He stated that this individual drove him to the victim's house and that another man was present at the house when he arrived. He stated that the victim and Robert, Jr., began arguing and fighting, whereupon the appellant took the victim's car keys and left. He stated that he heard a loud noise, "Co-Bloom," from the house as he was leaving. He also stated that the blood on his clothes came from the cut that he had suffered on his arm several days previously.
In his second statement, the appellant acknowledged that he had seen the victim at the club and stated that the victim had asked the appellant to ride home with him. He stated that he declined the offer and left the club by himself; however, Robert, Jr., then arrived outside the club in the victim's car and he rode with him to the victim's house. He again stated that there was another man present at the house. He stated that he left alone in the victim's car and drove down to the project. He stated that when he returned to the house, at approximately 4:00 to 4:15, he found the door open, went inside, and found the victim laying on the floor. He stated that he knelt in the blood and attempted to roll the victim over to determine whether he was all right. He saw that he also got blood on his clothing when he touched the victim. He stated that he saw no one else in the house, and that he then left in the victim's car.
The appellant's trial testimony recounting what transpired is set out in the statement of facts, supra.
A review of the record indicates that there is no plausible theory of the evidence that would indicate that the appellant caused the victim's deatheither intentionally, recklessly, or while intoxicatedbut did not take the victim's property. Although the appellant testified at trial that the victim had given him permission to take his automobile to buy beer, even if this statement is true, it is clear that this permissive use did not extend beyond the victim's murder, or that the victim ever gave him permission to take the victim's checkbook or other property.
Thus, "neither the evidence presented by the prosecution nor that presented by the defense provides a rational basis for a verdict of [these lesser included offenses]." Parker v. State, 587 So.2d 1072, 1083 (Ala.Cr.App. 1991).
"The jury should be charged on a lesser included offense when there is a reasonable *1329 theory from the evidence to support such a position. Ex parte Julius, 455 So.2d 984 (Ala.1984), cert. denied, 469 U.S. 1132, 105 S.Ct. 817, 83 L.Ed.2d 809 (1985). `A trial judge may refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support the jury's being charged on the lesser included offense.' Gurganus v. State, 520 So.2d 170, 174 (Ala.Crim.App. 1987). When the accused denies committing the offense charged, he is not entitled to instructions on a lesser included offense. Daly v. State, 442 So.2d 143 (Ala.Crim. App.1983)."
Dill v. State, 600 So.2d at 360. See also White v. State, 587 So.2d 1218, 1231 (Ala.Cr. App.1990), affirmed, 587 So.2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).
Finally, although the appellant argues that the prosecutor exacerbated this alleged error by arguing that the appellant was either guilty of capital murder or not guilty at all, the prosecutor's argument was clearly based on the State's evidence and was therefore proper. Henry v. State, 468 So.2d 896 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (1985).

IV
The appellant argues that the trial court erred in allowing him to be removed from the courtroom during portions of his trial, including the pronouncement of his death sentence. The record indicates that all of the appellant's absences occurred during the sentencing phase of his trial. The record indicates the following as to these episodes:
"A [Appellant's mother, during the sentencing phase before the jury].... One thing I do knowmy son ain't killed nobody, I know this. He don't have the nerve or guts to kill nobody.
"[Defense Counsel]: May we have a few moments outside the presence of the jury?
"THE COURT: If you wish, sure. Do you want to come back here with your man or do you want the jury to go back to the jury room?
"[Defense Counsel]: I think it might be best if the jury went back to the jury room.
"THE COURT: All right.
"(Whereupon, the jurors retired to the jury room at 4:50 p.m. and the following was had and done out of the presence and hearing of the jury:)
"[Defense Counsel]: Judge, for the record, I believe Mr. Jackson wishes to waive his physical appearance at this particular phase of the trial.
"THE COURT: Well, I have never been known as a real shrewd person, [Defense Counsel], but perhaps his emotion before the jury would not be ill-suited for your client, I don't know. But, you make an intelligent waiver and certainly he can be removed if he wishes. But, I hope it is voluntary and well thought out. He has the right to get in front of the jury himself, as he should well know, and speak.
"[Defense Counsel]: I think it be best if I stand on the other side.
"THE COURT: Well, just whatever you want to do. It is not uncommon for display like this to be in front of the jury. Whatever you
"[Defense Counsel]: We are fine, sir.
"THE COURT: All right...."
Thereafter, the jury was returned to the courtroom and the appellant's mother pleaded for her son's life, whereupon the following transpired:
"A [Appellant's mother]: He may do a lot of things, but God's sake, God's sake, God's sake he did not do that. I love him, he loves me, he loves his family. He's not that type child. God knows in heaven he is not. Please, please.
"THE COURT: Are you asking the jury to spare your son's life, ma'am? If you want to look at them and ask them that, you can.
"THE WITNESS: Please spare him, please, for God's sake, please.
"MR. KENNETH JAMES JACKSON: Let me go. Let me go.
"THE COURT: Stay in there with him, Andy. You can leave the door ajar. Tell Andy not to talk to him, Claude.

*1330 "(Defendant Kenneth James Jackson and Bailiff Andy Willis stepped inside small room.)
"THE COURT: He can come back whenever he wishes, Andy. Ms. Jackson, thanks for your comments. Do you have anything else to say to the jury today? If you want to compose yourself for a minute and say something else, you are welcome to. You don't have to, you understand that. Walter will help you back to the bench if you are ready to go.
"THE WITNESS: I just want you all to spare my son, please. I am sorry about the other man, God knows I am. And I can sympathize with the family. But, God knows I know my child didn't do that. I know he didn't.
"THE COURT: Thank you so much, Ms. Jackson.
"(Witness leaves witness stand.)
"THE COURT: Does your man understand he can speak to the jury, [Defense Counsel]?
"[Defense Counsel]: Yes, sir. He desires not to.
"THE COURT: All right.
"(Kenneth James Jackson reenters courtroom.)
"THE COURT: Mr. Jackson, you can say whatever you like.
"MR. KENNETH JAMES JACKSON: First of all, I would like to say excuse me for my appearance....
". . . .
"... Now, you the jury takes me away from my family, that's the law. I guess you all had to do this, I don't understand it. But, they're nothing that can be done about it, y'all done what you had to do. Only thing I want to say and it's going to be on the record, y'all have got family, y'alls got kids, I hope y'all realize what y'all have done. I'm finished, I don't want to talk any more.
"THE COURT: Any other evidence, [Defense Counsel], that you would like to submit on the question of punishment?
"[Defense Counsel]: No, sir, that's it. We now rest.
"THE COURT: Would your man want to continue to listen to the rest of the proceedings?
"[Defense Counsel]: Yes, sir.
"THE COURT: Do you want to stay in the courtroom, Mr. Jackson?
"MR. KENNETH JAMES JACKSON: I am okay."
Thereafter, during the prosecutor's closing argument the following transpired:
".... But, you should also listen to his [the appellant's] last words: `Y'all have to live with what y'all have done.' He has to live with what he has done.
"You have performed a vital function. You have considered evidence and you have spoken and you have found him guilty of
"THE COURT: Go ahead. Mr. Jackson wants to vacate the area and he is welcome to. Go ahead.
"MR. KENNETH JAMES JACKSON: You'll pay for it
"THE COURT: No, sir.
"MR. KENNETH JAMES JACKSON:  One way or the other
"THE COURT: Andy, Andy.
"MR. KENNETH JAMES JACKSON:  You're going to pay.
"THE COURT: Claude.
"[Prosecutor]: I'll pay for it, you'll pay for it, his mother will pay for it, [the victim's] family will pay for it. But, Kenneth Jackson won't. Kenneth Jackson won't, won't ever pay for it.
"Do not let this outburst influence you in any way....
"THE COURT: [Defense Counsel], I guess you could hear your man, he wanted to leave. I could hear and see he wanted to leave. Is this all right with you?
"[Defense Counsel]: Yes, sir, it's fine.
"THE COURT: He doesn't have to attend if he doesn't want to, as you know. May I proceed?
"[Defense Counsel]: Yes, sir.
"THE COURT: Do you want me to see if he wants to come back?
"[Defense Counsel]: No, sir.

*1331 "THE COURT: Would you like to see if his mother would like to come in?
"[Defense Counsel]: Yes, sir.
"THE COURT: I would hate for somebody to say, well, I wish I had heard the balance of the proceedings.
"(Whereupon, the mother was brought into the courtroom.)"
Thereafter, the trial court charged the jury, and the jury retired for deliberations and returned with its advisory verdict of death by electrocution. The trial court then spoke with defense counsel concerning the scheduling of the sentencing hearing before the trial court, following which the trial court said:
"THE COURT: Mr. Court Reporter, make a note that the defendant absented himself earlier.
"Andy, was it your impression, sir, from taking the young man back to the jail awhile ago, that he may have been hostile if he had come back?
"MR. WILLIS: I am thoroughly convinced it would have been a security violation. It would have been a very dangerous situation, Your Honor.
"THE COURT: Well, Walter, note that he was not here."
Subsequently, during the sentencing phase before the trial court, the judge summarized the appellant's absence during the sentencing phase before the jury, stating:
"THE COURT: .... The defendant was not presentI am reading from my noteshaving voluntarily absented himself from the proceedings, plus I was of the opinion that his presence would pose a security risk....
". . . .
"THE COURT: As I recall, [Defense Counsel], your client's mother was on the witness stand at the second stage and we were going through the protocol of trying to get the jury to see it her way and come in with life without parole and your man became upset with his mother being on the stand and decided to exit and made some remarks as he exited about whatever he said. Did you write it down, Walter?
"THE REPORTER: Yes, sir.
"THE COURT: As best you could?
"THE REPORTER: Yes, sir.
"THE COURT: Something about the jury not being able to sleep at night or something, I don't know what he said. But he wanted to leave, did you not, Mr. Jackson?
"MR. KENNETH JAMES JACKSON: Yes, sir.
"THE COURT: You didn't want to finish listening to your mother, am I correct?
"MR. KENNETH JAMES JACKSON: Correct."
Thus, the record indicates that, after the appellant's first request, through counsel, to be absent during his mother's testimony, the appellant decided to remain in the courtroom, and did so until she again pleaded for his life. At that time, the appellant stated, "Let me go. Let me go." He was taken to a small room beside the courtroom, and the door was left open, apparently so that the appellant could hear the proceedings. The only testimony that occurred during this first brief absence was his mother's continued request that the jury spare her son. The appellant's second absence, which precluded his presence during the trial court's oral charge and the return of the verdict, occurred when he became extremely agitated and verbally threatened the prosecutor and apparently the jury. It is clear from the bailiff's testimony that this outburst, and the appellant's subsequent conduct as he was taken to the jail, indicated that he posed a security risk.
The appellant never objected at trial to being absent from any part of the proceeding and, therefore, any error would have to amount to plain error, pursuant to Rule 45A, A.R.App.P. See McGahee v. State, 632 So.2d 976 (Ala.Cr.App.1993) (the appellant's absence during the jury qualification process constituted plain error; however, because the jury, which was selected only for sentencing purposes, returned a verdict of life imprisonment without parole, the appellant was not prejudiced and the court concluded that this "plain error" did not amount to reversible error). Cf. Flowers v. State, 608 So.2d 764 (Ala.Cr.App.1992) ("[A] defendant who has been present for the beginning of the guilt adjudication stage of his trial and then voluntarily *1332 absents himself forfeits his right to be present for the remaining portions of his trial, including the sentencing stage, if sentencing immediately follows the verdict." See Rule 9, A.R.Cr.P.
As to the appellant's brief initial absence at his own insistence, we conclude that he suffered no prejudice. The record seems to indicate that, although he was not in the courtroom, he could hear what little testimony that transpired. Although he was not sitting next to his attorney, so that it would have been difficult for him to offer any possible aid toward his defense, in light of the testimony that transpired, his presence would not have aided in his defense. See Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala.1993). Furthermore, in this case, the appellant was immediately allowed the opportunity to address the jury following his absence.
As to the appellant's second absence, during which the sentencing jury was charged and its advisory verdict was returned, the appellant was clearly removed because of his disruptive behavior. Rule 9.2, A.R.Cr.P. establishes a method for dealing with disruptive or disorderly defendants, based on Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), and the A.B.A. Standards for Criminal Justice, Special Functions of the Trial Judge 6-3.8 (2d ed. 1986). Committee Comments, Rule 9.2, A.R.Cr.P. This rule, which immediately follows Alabama's rule on a defendant's right to be present, states:
"(a) Disruptive Conduct. If a defendant engages in disruptive or disorderly conduct so that the trial or other proceeding cannot be carried on in an orderly manner, the court, after having warned the defendant of the consequences of such conduct, may, if such conduct continues, order the defendant to be bound and gagged, or otherwise restrained or removed from the trial or proceeding. If the defendant continues such disruptive or disorderly conduct after warning, he shall be deemed to have forfeited the right to be present at the trial or proceeding.
"(b) Reacquisition of the Right to Be Present. The court shall grant any defendant so removed or restrained reasonable opportunities to return to the trial or proceeding upon the defendant's personal assurance of good behavior. Any subsequent disruptive or disorderly conduct on the part of the defendant may result in the defendant's restraint or removal without additional warning.
"(c) Continuing Duty of Court. The court shall employ reasonable means to enable a defendant removed from a trial or proceeding under this rule to hear, observe, or be informed of, the further course of the trial or proceedings and to consult with counsel at reasonable intervals."
In the present case, the appellant's threatening behavior was clearly disruptive and he was properly removed from the proceeding. There is no indication that he ever made an assurance of good behavior, until the subsequent sentencing hearing before the trial court. The trial court did request that the appellant's mother be returned to the courtroom so that she could hear the remaining proceedings and inform the appellant. The appellant's defense counsel was also present.
According to the committee comments to Rule 9.2, there is "a preference for removal of the defendant from the courtroom rather than binding and gagging the defendant and permitting him to remain. However, there may be instances in which binding and gagging is the only method available to the court for dealing with a disruptive defendant, such as where the defendant is charged with the commission of an offense that may be punishable by death...."
In the present case, we cannot say that the trial court's decision to have the appellant removed from the courtroom, rather than allow him to remain, but to have him bound and gagged constituted plain error. See Proffitt v. Wainwright, 685 F.2d 1227, 1260 (11th Cir.1982), cert. denied, 464 U.S. 1002, 1003, 104 S.Ct. 508, 509, 78 L.Ed.2d 697, 698 (1983).
"Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with *1333 that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. Moreover, one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint."
Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970).
"It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations."
Id. at 343, 90 S.Ct. at 1061.
In the present case the appellant's presence presented an immediate security problem. Based on the totality of the circumstances, and in light of the discretion which must be vested in each trial court as to the best recourse to maintain the necessary decorum of judicial proceedings, the appellant's absence during this stage did not constitute plain error.

V
The appellant argues that the prosecutor "employed blatantly improper arguments" to the jury during the guilt and penalty phases. Specifically, the appellant argues that the prosecutor made comments containing misrepresentations of the law, made arguments based on her personal knowledge from previous cases in which she had been involved in, referred to the appellant's incarceration, referred to uncharged crimes allegedly committed by the appellant, made arguments bolstering the State's witnesses, supported false testimony, and made "numerous other ... prejudicial arguments."
The record indicates that, after the attorneys' arguments at the close of the guilt phase, the appellant moved for a mistrial, alleging that the prosecutor had made comments in which, he argued, she attempted to establish the credibility of the coroner and of certain witnesses who had seen the appellant at the club; that she had made certain statements allegedly giving her opinion based upon cases that she had tried in the past; that she commented on appellant's having been incarcerated since the offense; and that she had commented that the jurors had not seen the photographs of the victim's charred body.
The prosecutor responded that the trial court had in fact made the jury aware that it was not going to see the pictures and that there had been extensive testimony by witnesses concerning the appearance of the victim's body. She also stated that the defendant, through cross-examination, established that he had been in jail since the offense, and that this testimony had been entered without objection. And finally the prosecutor stated that she believed it to be her duty to establish the credibility of each of her witnesses during her closing statement.
The trial court responded that many of these comments to which the appellant was objecting were properly based on the evidence or were reasonable inferences from the evidence. He further stated that he believed that arguments advancing the credibility of witnesses was an aspect of advocacy; he referred to the prosecutor's statements that she believed that a certain uninterested witness had been telling the truth about who she had observed get into the car with the victim. The trial court however, admonished that the prosecutor to refrain from referring to other cases she had tried and "how this *1334 case best illustrates, among all those cases you tried, this, that, or the other." The trial court then stated that it would instruct the jury to that effect, and stated that, "I don't take anything [the prosecutor] has said to be out of line." The trial court commented that it did not believe that the prosecutor's statements about the photographs were an attempt to reprimand the trial court for failing to allow certain photographs of the victim into evidence, and defense counsel replied, "I understand, sir, I did not take it that way myself." The trial court then denied the appellant's motion. No objections were made by the appellant to the prosecutor's statements during sentencing.
The appellant alleges that the prosecutor misstated the law concerning the lesser-included offense of felony murder, by explaining this concept using a "law school text example" of felony murder, as well as an example from a case that had been previously handled by the prosecutor. It should be noted that the approach taken by the circuit court in preparing and instructing the jury included a great deal of legal education and illustration. The trial court used charts, which it had prepared, to explain lesser included offenses to the jury. In this same vain, the prosecutor attempted to explain the concept of felony murder, especially differentiating it from capital murder, by relating two scenarios that constituted felony murder. The prosecutor never indicated that these two examples were the only scenarios that could constitute felony murder, and the trial court subsequently explained this concept in detail to the jury. There is no indication in the record that the jury was in any way misled as to the meaning of felony murder.
In Johnson v. State, 620 So.2d 679, 702 (Ala.Cr.App.1992), reversed on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.1993) this court stated:
"The appellant claims that the prosecutor injected unsworn testimony into the case by referring to his recollection of a male nurse who had treated his father when he was in the hospital several years earlier. This argument has no merit. The record reveals that, while discussing [a witness's] identification of the appellant, the prosecutor argued that there is a difference between what a person sees in her mind and what that person can put down on paper. The prosecutor referred to his father's hospitalization simply as a means of illustrating his point while in the process of properly drawing his conclusions from the evidence.... While a prosecutor should avoid comment on matters that are not supported by the evidence, we do not interpret the prosecutor's comments here as an effort to cajole the jury into reaching a verdict on the basis of the prosecutor's importance or credibility."
The appellant also argues that the prosecutor's reference to her awareness that Anthony Shuford was in prison, was an improper comment based on matters not in evidence. However, this comment was based on the rebuttal testimony of a State's witness, who stated that Anthony Shuford had been in jail since early 1988 and that the prosecutor had in fact prosecuted that case.
"These were legitimate comments on the evidence presented at trial. A prosecutor may argue in closing any evidence that was presented at trial. He may also `"present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way."' Williams v. State, [Ms. 89-191, June 14, 1991] [601] So.2d [1062, 1072-73] (Ala.Cr. App.1991), aff'd, [without opinion] [Ms. 1901682, March 6, 1992] [662] So.2d [929] (Ala.1992), quoting Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App.1986). See Bankhead v. State, 585 So.2d 97 (Ala.Cr. App.1989), remanded on other grounds on rehearing, 585 So.2d 112 (Ala.), on remand, 585 So.2d 133 (Ala.Cr.App.1991), aff'd on remand, [Ms. 6 Div. 370, February 28, 1992] [625] So.2d [1141] (Ala.Cr.App. 1992)."
Williams v. State, 627 So.2d 985 (Ala.Cr.App. 1991) (on application for rehearing opinion), affirmed, 627 So.2d 999 (Ala.1993). While the testimony by the State's rebuttal witness that the prosecutor had in fact prosecuted that prior case may not have been relevant, *1335 that testimony did not constitute reversible error.
The appellant also argues that the prosecutor attempted to improperly suggest that he had raped the victim, as well as committed the arson. However, the prosecutor could reasonably infer from the evidence that the appellant committed the arson, because by the appellant's account of what happened on the night in question, including amounts of time that the appellant estimated that he spent at each activity included in time period, the appellant would have had to have been in the house when the fire was started. Moreover, there was evidence that, although the state fire marshall's representative found no evidence of accelerants, a gas cap from the appellant's automobile was found on the appellant's back steps, and when the appellant was apprehended with the victim's car, the opening to the gas tank was covered with aluminum foil. A witness who had been with the victim earlier in the afternoon testified that the gas cap was on the victim's automobile at that time. Additionally, there was expert testimony that semen was found on the appellant's boxer shorts, and the coroner identified two bruised areas in the victim's rectal area which would have been consistent with some sort of trauma. Thus both comments would be legitimate inferences from the evidence. "`Whatever is in evidence is considered subject to legitimate comment by counsel.' Bankhead, 585 So.2d at 97." Jenkins v. State, 627 So.2d 1034, 1051 (Ala.Cr. App.1992), affirmed, 627 So.2d 1054 (Ala. 1993).
The appellant argues, concerning one of the grounds he had argued in support of his motion for mistrial, that the prosecutor made certain improper arguments based on personal knowledge and noted that the trial court acknowledged that these arguments were improper. The trial court admonished the prosecutor not to make arguments that "of all the cases I have tried ... this case was the most...." The trial court gave the jury subsequent instructions as to its evaluation of the attorneys' comments. Moreover, these comments must not be viewed in the abstract. Wysinger v. State, 448 So.2d 435 (Ala.Cr.App.1983).
"In light of the brevity and isolated nature of the remarks and the thorough instructions of the trial court which charged the jury that they were the exclusive judges of the evidence in the case and the sole judges of the credibility of the witnesses, we find that the remarks, although inappropriate, do not constitute reversible error. The statements did not so infect the trial with unfairness `as to make the resulting conviction a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citation omitted)."
Dill v. State, 600 So.2d at 358-59.
The record reveals only one remark by the prosecutor that clearly indicated any type of comparison with other cases. This remark, in the context of the entire argument, did not constitute reversible error.
In Smith v. State, 588 So.2d 561, 572 (Ala. Cr.App.1991), the appellant argued that the prosecutor improperly commented that "this case is one of the most gruesome and terrible [cases] that I have ever been involved with." This court held that:
"This comment was based on a legitimate inference drawn from the evidence and did not constitute an impermissible injection of the prosecutor's personal opinion. The atrocity of this crime was clearly in evidence through the admission of the pictures, as well as through the testimony of the witnesses to the scene of the crime and the physician's testimony to the condition of the victim's body."
See also Smith v. State, 581 So.2d 497 (Ala. Cr.App.1990), reversed, 581 So.2d 531 (Ala. 1991) (Alabama Supreme Court held as plain error a comment by the prosecutor inferring that the defendant would kill again, but did not find as plain error the prosecutor's statement that the defendant was one of the worst ever to come into the county.)
The appellant argues that the prosecutor's statement that the appellant was either guilty of capital murder or not guilty of anything was improper. However, this argument was based on the State's evidence and was a reasonable inference therefrom. "Argument by the prosecution concerning omissions *1336 and inconsistencies in the defendant's version of the case is not improper. Speigner v. State, 369 So.2d 39 (Ala.Crim.App.), cert. denied, 369 So.2d 46 (Ala.1979). See also Sasser v. State, 494 So.2d 857 (Ala.Cr. App.1986)." Salter v. State, 578 So.2d 1092, 1096 (Ala.Cr.App.1990), writ denied, 578 So.2d 1097 (Ala.1991).
The appellant argues that the prosecutor improperly referred to his having been incarcerated since his arrest. However, the record indicates that the appellant acknowledged, in response to a question by the prosecutor on cross-examination, that he had been imprisoned since that time. Thus this matter was in evidence and the comment was proper. Cf. Nelson v. State, 595 So.2d 506, 508 (Ala.Cr.App.), reversed on other grounds, 595 So.2d 510 (Ala.1991) (prosecutor references to the defendant's having been convicted of a felony and having been a violent person were proper where the defense had introduced evidence that the appellant had been convicted of an offense and, on cross-examination by the prosecutor, the defendant had stated, "I am violent"). Similarly, the appellant argues that the prosecutor improperly referred to facts of an unrelated burglary that he allegedly committed. However, the record is clear that evidence concerning this prior burglary was properly introduced and that, therefore, the prosecutor was free to comment on that evidence.
The appellant argues that the prosecutor bolstered her witnesses' testimony, i.e., that she improperly vouched for, or gave her personal opinion of, the credibility of certain State's witnesses. However, although the prosecutor reiterated the coroner's qualifications as an expert and argued that the witnesses who had been present at the club on the night of the offense had no reason to lie and nothing to gain by lying, she never stated that she personally "vouched for" any of their testimony. Thus, the prosecutor's comments were more in the nature of drawing inferences from the evidence rather than vouching for credibility of the witnesses.
"The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused posed two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. See Berger v. United States, 295 U.S. [78], at 88-89, 55 S.Ct. [629], at 633 [79 L.Ed. 1314, 1335]."
United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). See also Ex parte Parker, 610 So.2d 1181, 1183 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993).
"`[I]t is highly improper for attorneys, particularly prosecutors, to state their personal opinions during closing arguments. Moseley v. State, 448 So.2d 450 (Ala.Cr.App.1984). Attorneys must be careful to refrain from injecting their own personal experience or knowledge in support of their argument, as distinguished from what they deem to be reasonable inferences to be drawn from the evidence. Moseley, supra; Brown v. State, 393 So.2d 513 (Ala.Cr.App.1981).'
"King v. State, 518 So.2d 191, 193 (Ala.Cr. App.1987). Cf. Cross v. State, 536 So.2d 155, 160 (Ala.Cr.App.1988) (prosecutor may argue the effect of a witness's testimony, but may not vouch for his or her credibility)."
Guthrie v. State, 616 So.2d 914 (Ala.Cr.App. 1993).
"Although we are acutely aware that `[a] criminal trial does not unfold like a play with actors following a script,' Geders v. United States, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976), and that an attorney caught up in the passion of a jury argument may occasionally say too much, we nonetheless cannot overlook the fact that prosecutors must avoid making personal guarantees as to the credibility of the state's witnesses." Ex parte Parker, 610 So.2d at 1187. However, the prosecutor's comments in this case did *1337 not constitute personal guarantees as to the witnesses' credibility, but rather were proper inferences from the evidence, and, therefore, did not constitute error.
The appellant argues that the prosecutor used the cloak of responsibility of her office to improperly bolster perjured testimony and the credibility of the State's witnesses. However, the testimony the appellant refers to as perjured concerns the appellant's location when the authorities took possession of the victim's checkbook. However, the record reveals that by stipulation the prosecutor had agreed not to refer to this actual location to avoid prejudicing the appellant. The witness had been instructed not to testify that the checkbook had actually been removed from the appellant while he was incarcerated at Kilby Correctional Center. The witness, when asked where the checkbook had been found, attempted to avoid reference to Kilby and eventually testified that the checkbook had been found somewhere else. When defense counsel subsequently objected to this matter at trial, the attorneys approached the bench, discussed this matter, and following an off-the-record discussion, defense counsel stipulated to the admission of the checkbook. Thus, although the State's witness gave false testimony, the appellant was not prejudiced thereby; therefore, no reversible error occurred.
The appellant's claim that the prosecutor used the cloak of responsibility of her office to improperly bolster witnesses is also not supported by the evidence. There is no support for this contention in the record. This court has held a similar claim to be without merit, stating:
"The appellant argues that the prosecutor and assistant prosecutor, in their initial remarks to the jury, emphasized their roles as representatives of the State. The record indicates that the prosecutor and the assistant prosecutor thanked the jurors for their service and referred to the fact that they represented the State and that the two defense attorneys represented the appellant. The Alabama Supreme Court has previously held that an argument of a prosecutor of a criminal case, wherein he explains his relation to organized society and his duty in the prosecution of the case, was not erroneous. Gallant v. State, 167 Ala. 60, 63, 52 So. 739, 741 (1910)."
Smith v. State, 588 So.2d at 569.
Moreover, the prosecutor's statements that the jury did not see all the photographs of the victim were not error. This court has previously decided a case where the defendant argued that the prosecutor stated facts not in evidence, by commenting to the jury that "I know [the coroner] made a lot more photographs than the ones that are included here." Smith v. State, 588 So.2d at 569. In that case, this court held that the prosecutor was referring to an autopsy report and to the fact that the report mentioned more photographs than those actually offered and admitted. Because the report was admitted into evidence, this court held that the prosecutor was not arguing facts that were not in evidence. Smith v. State, 588 So.2d at 569.
A review of the entire closing argument by the prosecutor reveals that there was no reversible error in any of her comments.
"Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, ... the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's [remark] would have on the jury's ability to judge the evidence fairly...."
United States v. Young, supra, 470 U.S. at 11-12, 105 S.Ct. at 1044. See Ex parte Parker, 610 So.2d at 1183-84.
"`Control of closing arguments rests within the discretion of the trial judge and we will not reverse unless there is an abuse of discretion.' " Salter v. State, 578 So.2d at 1096, quoting Sasser v. State, 494 So.2d 857, 860 (Ala.Cr.App.1986). There was no such abuse in this case.

*1338 VI
The appellant argues that the trial court's instructions to the jury at both the guilt and sentencing phases were improper and misleading, and that they violated the appellant's rights to due process and to a fair trial. The appellant specifically refers to the trial court's instructions on felony murder, accomplice liability, and reasonable doubt. The appellant never objected at trial to any instructions by the trial court; therefore, these claims must be evaluated pursuant to the plain error doctrine. Rule 45A, A.R.App.P.
The appellant argues that the trial court improperly charged the jury on felony murder. The record indicates that the trial court did erroneously charge the jury on two occasions that the killing in a felony murder offense must be intentional; however, that reference was an isolated mistake in the context of repeated proper instructions as to this offense. Therefore, this error was harmless. The record indicates that the trial court charged the jury as to the difference in capital murder and felony murder as follows:
"Felony murder, no intentional killing is required. But the deceased person must have been intentionally killed either by Mr. Jackson, the defendant, or one with whom Mr. Jackson was acting in concert with, as will be defined. That he or his accomplice strangled the deceased for the specific purpose of taking Mr. Henderson's life.
"Now, to act intentionally or purposely in the killing component is what distinguishes capital murder from felony murder.
"You can see there, drop down to two, you don't see the word `Intentional' there on the killing component, it is absent."
After instructing the jury as to capital murder, and the element of intent required therein, the trial court charged as follows:
"If after considering the capital offense charge, folks, you are not convinced beyond a reasonable doubt or to a moral certainty that the defendant is guilty, then you consider the next offense down the line in terms of culpability, felony murder. Now, that's a killing during a robbery in any degree. I thought I would read you this statute here. A killing, you see, is not the product of one's intentional acts, can result from accident, recklessness, negligence, simply must be a death resulting from the commission of a robbery.
"I will paraphrase the statute, now, of felony murder. One commits the crime of felony murder if he commits or attempts to commit robbery in any degree and in the course of and in furtherance of the crime that he is committing or attempting to commit or in immediate flight therefrom, he or another participant, if there be any, causes the death of any person.
"So, you see here your accomplice liability doctrine is written into the felony murder doctrine. No intent to kill required.
"So, you see, if you are convinced beyond a reasonable doubt that the deceased died as a result of being robbed by the defendant, or again, one with whom the defendant was acting in complicity, that would sustain a verdict of guilty of felony murder. Death after the intentional or purposeful requirement resulting from the commission of a robbery."
The trial court again improperly indicated that felony murder required that the murder be committed intentionally during his charge on accomplice liability. However, immediately thereafter, he again explained that the difference in felony murder and capital murder was that in felony murder "no intentional killing is required."
In the context of the Court's entire charge, the trial court properly instructed the jury that the intent requirement present in capital murder was required to commit the offense of felony murder. Moreover, the record indicates that the trial court constructed a chart of the elements of each offense, properly instructing that intent was not an element of felony murder, and that this chart was supplied to the jury for its deliberations, as well as used during the trial court's instructions. Therefore, the trial court's erroneous charge did not rise to the level of plain error in this case.
The appellant argues that the trial court gave an improper and misleading instruction on accomplice liability, which increased *1339 the likelihood that he would be convicted of capital murder, in allegedly implying that the appellant may be guilty as an accomplice if he "had knowledge of the intentional killing." However, this portion of the trial court's charge is taken out of context, in that it was merely a phrase establishing the requirements of knowledge necessary to find the appellant guilty as an accomplice. The record indicates that the trial court gave an extensive charge to the jury concerning accomplice liability and that that charge was proper.
The appellant's contention that the trial court erred in its instructions as to the reasonable doubt standard by allegedly giving a burden-shifting charge, in violation of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), is not supported by the record. There was no language by the trial court creating a mandatory presumption that would shift the burden of proof from the State to the appellant. The charge that the appellant complains of is as follows:
"I would say to you that if after a full and fair consideration of all the evidence in the case, if there should remain in your collective minds an abiding conviction that Mr. Jackson here is guilty of an offense charged, then you would be convinced beyond a reasonable doubt and you should convict.
"On the other hand, if after the same and full and fair consideration of all the evidence in the case, if there does not remain in your minds an abiding conviction that he is guilty, then you would not be convinced by that full measure of proof required in the law and he should be acquitted."
There is no impropriety in this charge. Nor was the trial court's language explaining reasonable doubt as "self defining, a doubt for which a good, sound, sensible reason could be given" improper. The trial court gave a thorough and correct explanation of this standard, and no error occurred.
The trial court made no error in its charge as to reasonable doubt or accomplice liability and, although the trial court erred in its charge on felony murder, because the jury was, after and before each improper statement, properly charged as to the law and shown a chart to aid in the understanding of the offenses and elements thereof, the error did not rise to the level of plain error. Dill v. State, 600 So.2d at 361-62.

VII
The appellant argues that the trial court erred in admitting the victim's checkbook into evidence because, he says, the State failed to establish a proper chain of custody. However, the record indicates that the checkbook was allowed into evidence on stipulation of the parties. When the prosecutor offered the checkbook into evidence, defense counsel originally objected, stating that a proper foundation for its admission had not been laid, because, he argued, there was testimony that only an envelope was found on the appellant's person when he was searched at the jail, and there was testimony from a State's witness that the witness had been given custody of the checkbook, but that witness did not appear to identify the party from whom he had gotten the checkbook. The prosecutor then stated, out of the hearing of the jury, that the State's witness had been instructed to testify only that the checkbook had been received from the Jefferson County jail, rather than from Kilby Correctional Facility, because of the prejudice that the appellant would suffer if it was revealed that he had been incarcerated in Kilby. The prosecutor further stated that, during discovery, all the parties had been informed that the checkbook had been obtained from Kilby Correctional Center. The court verified that it had been under the impression that an agreement had been reached during the suppression hearings that this testimony would be the best way to handle the situation. Defense counsel agreed that he understood that an attempt was to be made not to mention Kilby Correctional Facility, but he did not understand that a State's witness would testify that he received it from someone who had not given it to him. An off-the-record discussion was then had between the parties, following which defense counsel agreed that, after consideration of all the circumstances, he had no objection to the admission of the *1340 checkbook and that it would go be admitted by stipulation.
Thus, the record clearly indicates that the appellant suffered no prejudice, and there is no indication that the checkbook was in any way altered or tampered with. McNair v. State, 653 So.2d 320 (Ala.Cr.App. 1992); Stewart v. State, 601 So.2d 491 (Ala. Cr.App.1992); Johnson v. State, supra. Because the checkbook was highly relevant in the present case and properly admitted into evidence, the trial court did not err.

VIII
The appellant argues that the prosecutor knowingly permitted false testimony from a government witness, thereby violating his rights to due process and to a fair trial. The false testimony the appellant refers to is the testimony of the State's witness concerning from whom he had received the victim's checkbook. However, as previously stated, although defense counsel indicated that he did not understand that the State's witness would testify falsely as to where he had received the checkbook, he did know that the witness was instructed not to reveal that the checkbook had been received from the appellant's personal effects at Kilby Correctional Center. The appellant did not object as to the false testimony at trial; therefore, this issue must be analyzed pursuant to the plain error doctrine. Rule 45A, A.R.App.P.
It is clear that the appellant suffered no prejudice by this false testimony. In fact, the false testimony served to cover up the fact that the appellant was incarcerated at Kilby when the checkbook was found. In Ex parte Frazier, 562 So.2d 560 (Ala.1989), the Alabama Supreme Court established the guidelines to determine whether a defendant should be granted a new trial on the grounds of perjured testimony. In that case, the Alabama Supreme Court established the following standard for use in death penalty cases when a claim of perjured testimony has been raised:
"In order to grant a motion for a new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; and 3) that the movant is not relying on evidence of which he was aware at trial and which he consciously decided not to use to challenge the testimony of the perjured witness."
562 So.2d at 570.
Analyzing the present facts under these guidelines, we must conclude that the appellant's claim cannot succeed. Although the testimony given by the witness at trial was false, there is no chance that, had the jury heard the truth, it would have reached a different result. In this case the appellant had been made aware through discovery that the source of the checkbook was Kilby Correctional Center, and he "consciously decided not to use [the evidence to] challenge the testimony of the perjured witness." Id. Therefore, none of the appellant's rights were violated and he suffered no prejudice on this ground.

IX
The appellant argues that a violation of his constitutional rights occurred where a veniremember was improperly excused for cause under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Specifically, the appellant argues that, despite the fact that the veniremember stated that he was "uncomfortable" with the death penalty, there was no indication that the veniremember would be unable to make a fair determination based on the evidence.
"`There are a number of recent United States Supreme Court cases on this point which are controlling authority. The original constitutional yardstick was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Court required that the juror make it unmistakably clear that he would automatically vote against capital punishment and that his feelings would prevent him from making an impartial decision as to guilt. This is no longer the test. Adams v. Texas, *1341 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), ruled that only those jurors whose rules on capital punishment would prevent or substantially impair the performance of their duties could be challenged for cause. Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), held that the test for excluding a venireman is whether the juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and oath. The Court expressly stated that the juror's bias did not have to be proved with unmistakable clarity. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), stated in part as follows:
"`"The precise wording of the question asked of [the venireman] and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstances recommend the death penalty. But Witt recognized that `determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.' [469] U.S. at [424, 105 S.Ct. at 852]. The trial court, `aided as it undoubtedly was by its assessment of [the venireman's] demeanor,' at [434, 105 S.Ct. at 857], was under the obligation to determine whether [the venireman's] views `would prevent or substantially impair the performance of his duties as a juror,' id., at [433, 105 S.Ct. at 857]...."'"
"`The Eleventh Circuit Court of Appeals held in 1983 in McCorquodale v. Balkcom, 721 F.2d 1493 (11th Cir.1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 546 (1984), that a prospective juror who responded to the death penalty questions, "I don't think I could do it. I really don't," has made it sufficiently clear that she could not impose the death penalty regardless of the evidence....
"The Fifth Circuit in Martin v. Maggio, 711 F.2d 1273 (5th Cir.1983), even held that the following equivocal responses would establish the necessary predicate for disqualification: "I don't know if I would vote for the death penalty." and "I don't know if I could do it." These are all euphemistic expressions of "no."'"
Nichols v. State, 624 So.2d 1328, 1335-36 (Ala.Cr.App.1992), quoting Watkins v. State, 509 So.2d 1071, 1073-74 (Ala.Cr.App.1986), affirmed, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). See also Brownlee v. State, 545 So.2d 151, 155-56 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
"`The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" Wainwright v. Witt, 469 U.S. 412 [424], 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [658], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proven with "unmistakable clarity" because "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id.

"`A trial judge's finding on whether or not a particular juror is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.'" Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. "A trial court's ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).'"
McWilliams v. State, 640 So.2d 982, 999 (Ala. Cr.App.1991), affirmed in part, remanded on other grounds, 640 So.2d 1015 (Ala.1993), *1342 quoting Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
"In determining whether a veniremember's views might prevent or `substantially impair the performance of his duties as a juror,' ... a trial court is aided by being able to observe the potential juror's demeanor and tone in responding. There is no special phrase that will resolve the indecisiveness of a potential juror's responses." Rogers v. State, 638 So.2d 1347 (Ala.Cr.App.1992), citing Watkins v. State, 509 So.2d 1071, 1073 (Ala.Cr.App.), affirmed, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
"`[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. [T]his is why deference must be paid to the trial judge who sees and hears the juror.'"
Coral v. State, 628 So.2d 954, 970 (Ala.Cr. App.1992), after remand, 628 So.2d 988 (Ala. Cr.App.1992), affirmed, 628 So.2d 1004 (Ala. 1993) quoting Wainwright v. Witt, 469 U.S. at 424-26, 105 S.Ct. at 852-53. (footnote omitted).
The record indicates that the following transpired during the individual questioning of the veniremember alleged by the appellant to have been improperly excused:
"QUESTIONS BY THE COURT:
"Q [...], I think you wanted to talk with us, you felt somewhat uncomfortable sitting in punishment. I think you kind of just wanted to chat with us.
"A. [Veniremember:] Let me just say it this way, I feel very uncomfortable in sitting in a case where the death penalty is involved or capital punishment is involved, I will put it that way. That's just my feeling on it, I feel very uncomfortable. Yes, I could make a decision; I feel like I could do that. And I could do it based on the evidence presented. But I would just feel extremely uncomfortable.
"Q. I can appreciate that. I can't imagine a hypothetical juror that is conscientious not being somewhat uncomfortable.
"A. I would be more so than other individuals having to do with human relations as my position does.
"Q. Let me tell you how the Judge looks at it, based on the law that's evolving in the supreme court. If a juror can conscientiously consider both modes of punishment, death by electrocution and life without parole, if you can conscientiously consider both alternatives, legally you are entitled to stay on the case. Now, one of the two sides may decide to strike you. I have been listening to you very carefully, sir, and I appreciate your remarks. Just tell me, could you conscientiously consider death by electrocution as a mode of punishment or do you reject it out of hand now before we start?
"A. That's kind of a hard question to really answer.
"Q. Yes.
"A. I'll be just as honest as I can, that's what I'm trying to be. That's why I asked to speak to you privately. It would be very difficult for me to come to a decision.
"Q. Okay.
"A. And I wouldn't want to be responsible for a hung jury or anything of this kind.
"Q. Okay. Well, I appreciate it so much. Does the State have any questions of this gentleman?
"QUESTIONS BY [PROSECUTOR]:
"Q. Are you saying that because of the fact capital punishment is an option, that it would be more difficult for your to decide guilt or innocence?
"A. Yes.
*1343 "QUESTIONS BY THE COURT:
"Q. Let me make sure he understood that question. [The prosecutor] wants to know, this is two phases, now. Guilt phase, guilty or not guilty, or if guilty, guilty of perhaps a lesser included offense or whatever. Are you saying that the prospect of the capital question looming over the horizon might affect your considerations on the guilt or innocence phase?
"A. Yes.
"THE COURT: [Defense counsel], any questions?
"[DEFENSE COUNSEL]: Yes, sir, I have just one to make sure I understand completely.
"QUESTIONS BY [DEFENSE COUNSEL]:
"Q. Sir, if you were chosen as a juror and after you heard all of the evidence in the case, could you decide your particular decision just based on the evidence that you have heard in this particular case?
"A. Yes.
"[DEFENSE COUNSEL]: Thank you, sir.
"THE COURT: We always get different reads in here and I get the last question.
"QUESTIONS BY THE COURT:
"Q. First of all, the jury that raises their hand in a little while is going to say `I solemnly swear or affirm to return a verdict based on the evidence and the law, so help me God.' Can you take that oath and return first a verdict on the question of guilt or innocence without regard to the potentiality of punishment? Because I am going to tell you not to be concerned with that. The threshold question is whether or not this man is guilty of capital murder or a lesser included offense or is he not guilty?
"A. Let me answer it in this manner.
"Q. Okay.
"A. If I did not know what the consequences were in this case or the options, if you will.
"Q. The options, because there are options.
"A. There are options. Then I think, yes, I could give a verdict, given the fact I could come to my own conclusions.
"Q. But for the knowledge of the potentiality of capital punishment?
"A. But for the knowledge of the potentiality, it wouldit would throw some blocks into my decision making.
"THE COURT: Thank you very much.
"[VENIREMEMBER]: I want to be honest about it."
Thereafter, the prosecutor moved to strike this veniremember for cause because, she argued, the potentiality of the death sentence would affect his ability to fairly decide the issue of guilt or innocence. Defense counsel then asked that the veniremember be informed that his decision concerning sentencing would be only a recommendation. The court responded that it preferred not to do so, because to do so may cause a juror to take his job less seriously. Defense counsel responded that the fact that the jury's decision concerning sentencing was merely a recommendation was a correct statement of law, and that it was his practice to inform the jury of this role. The trial court then stated that, if defense counsel so requested, the potential juror would be brought back at his request. The record indicates that the potential juror was brought back for further questioning, during which the following occurred:
"QUESTIONS BY [DEFENSE COUNSEL]:

"Q. Sir, earlier you stated you would not be able under any circumstances to bring back a death penalty verdict; is that correct?
"A. I said knowing the penalty involved it would make it difficult for me to come to a real decision.
"Q. Would it aid you, sir, in coming to that decision if you were aware that your decision at that particular time would only be a recommendation and not an absolute decision?
"A. Judge, could you help me on that?
"Q. Well, I think I should.
"QUESTIONS BY THE COURT:

"Q. This is a jurisdiction, sir, where it is called, the Judge has an override. The trial judge ultimately can sentence the offender *1344 to what he deems to be the appropriate sentence under the law. The jury's verdict is really advisory. But, you should know this: That it would be rare for the Judge to go against the jury's advisory verdict.
"It is recommended, [Defense Counsel], in jurisdictions that have jury overrides, where the jury knows it is advisory only, that the Judge tell the jury and tell them how important their advisory opinion is. There is a case out on that very question. I forgot the style of the case, I can find it.
". . . .
"QUESTIONS BY THE COURT:

"Q. But although your decision is advisory only, don't put the accent on the word `only' because the Judge takes it into consideration, by statute he must take it into consideration. But, you know nowI didn't tip my hand to everybody about this because I don't want to diminish the jury's role. [Defense Counsel] wants to know, you knowing now that the Judge can change it from death to life without parole or visa versa, does that address itself to your concern?
"A. Not completely, no. I'm saying this, where I know that the decision will be made and I certainly would have a part being a juror in that decision of capital punishment, that this would make it exceedingly difficult for me toI would have a battle with it in my own mind.
"Q. On the guilt or innocence phase?
"A. On the guilt or innocence, I would have a real battle.
"Q. You could not differentiate the ultimate question of capital punishment from the issue of guilt or innocence, as I heard you say a while ago?
"A. Yes, sir.
"Q. And you still say that?
"A. Yes, I still say that.
"Q. Okay.
"A. It concerns me very much, Judge. Again, folks, I am honest about it.
"Q. I appreciate it.
"A. I'm not trying to get out of anything, I just have a deep feeling about it and I am concerned about it.
"Q. I think everyone should have deep feelings about it.
"A. I don't want to mislead anybody.
"Q. You are the ideal juror, you are telling us what is on your mind.
"A. It is on my mind."
Thereafter, the trial court informed defense counsel concerning the striking for cause of this potential juror, "[H]e is still off, he is intractable, he is not going to come around." Defense counsel responded, "Yes, sir, I understand completely."
Based on the potential jurors' responses during voir dire questioning, it is clear that his views on capital punishment would substantially impair his performance as a juror. Therefore, there was no error in this strike for cause.

X
The appellant argues that the trial court erred in failing to strike for cause a potential juror who revealed that his cousin had been raped and murdered three years earlier.
The record indicates that during the prosecutor's questioning of the venire panel she asked whether there were any individuals on the venire who had been victims of violent crimes, or whose family members or close friends had been such victims. Among those responding, a potential juror stated that his cousin had been murdered and raped approximately three years earlier. The prosecutor asked if a specific individual was this veniremember's cousin. The venireman responded affirmatively. The prosecutor then stated that she was "very aware" of that case, that she had been the prosecutor, and, further, that the trial judge in this case had served as trial judge. The prosecutor then asked the potential juror if he had attended any of the legal proceedings in that case. He responded that he had not. The prosecutor then asked:
"[PROSECUTOR]: Would the fact that [your cousin] was murdered and harmed in such a way, would that personally affect you?

*1345 "[VENIREMEMBER]: I don't believe it would.
"[PROSECUTOR]: Would you be able to separate her case from Mr. Jackson's case?
"[VENIREMEMBER]: Yes, ma'am.
"[PROSECUTOR]: They are totally separate cases.
"[VENIREMAN]: Yes.
"[PROSECUTOR]: Thank you."
The record indicates that no further questions were asked of this veniremember concerning this matter, and that there was no motion to strike him for cause. Therefore, this claim must be analyzed pursuant to the plain error doctrine. Rule 45A, A.R.App.P.
"`The test to be applied is can the juror eliminate the influence of his scruples and render a verdict according to the evidence. Ordinarily a juror is not disqualified where it appears that he is willing to follow the instructions of law given by the trial court and is able to decide the case impartially according to the evidence notwithstanding his scruples. The determination of this question is based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Tidmore [v. City of Birmingham, 356 So.2d 231 (Ala. Cr.App.1977), cert. denied, 356 So.2d 234 (Ala.1978).'"
Clark v. State, 621 So.2d at 318, quoting Barbee v. State, 395 So.2d 1128, 1130-31 (Ala.Cr.App.1981).
"Furthermore, `[w]hen a common law ground is at issue there must be a showing of absolute bias leaving nothing to the discretion of the trial court, or there must be a mixed question of law and fact to be determined by the trial court exercising its sound discretion. [Citation omitted]' Stewart v. State, [405 So.2d 402, 408 (Ala.Cr. App.1981)]. `We find that this case presents a matter within the discretion of the trial court. A trial court's ruling on challenges for cause based on bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Price v. State, 383 So.2d 884 (Ala.Cr.App.), cert. denied, 383 So.2d 888 (Ala.1980); Motes v. State, 356 So.2d 712 (Ala.Cr.App.), cert. denied, 356 So.2d 720 (Ala.1978).' Id. Because [the juror] in the present case stated that [he] would base [his] decisions on the evidence and the trial court's instructions, we find that the trial court did not abuse its discretion."
Kinder v. State, 515 So.2d 55, 61 (Ala.Cr. App.1986).
In the present case, based on the veniremember's assurances that he could decide the case based on the evidence, there is no indication that this matter rose to the level of plain error.

XI
The appellant argues that the trial court erred in permitting witnesses who had violated the court's sequestration order to testify without first determining whether their testimony had been tainted by their failure to obey the court's order. The record indicates that, following the testimony of a State's witness, the appellant moved for a mistrial because, he said, he had been told by the appellant's mother that the remaining State's witnesses had been discussing possible testimony in the witness room. The court denied the motion, unless the appellant could show that he had been prejudiced by these alleged actions. The prosecutor indicated that when she had been informed of this allegation, she had spoken with the witnesses and had told them to refrain from discussing the case. Defense counsel asked that the appellant's mother be allowed to testify, and she was then called before the court. The appellant's mother stated that she had been sitting in the witness room and had heard certain witnesses discussing their planned testimony. The trial court then asked the appellant's mother if the witness who had just testified had been among those discussing the case, and she responded that she had not heard him participate in the discussion. The trial court responded that it would speak to each and every witness for the State concerning this matter. The trial court then denied the appellant's motion for a mistrial, and the court called all of the witnesses who had been present in the witness room before the court. When defense counsel objected to the trial court's denial of his motion, the trial *1346 court responded, "We haven't even heard these witnesses testify yet.... If I see that someone's testimony coming up is somehow tainted, I will certainly grant your motion for mistrial." Thereafter, the witnesses were brought into the courtroom and identified. The following then transpired:
"THE COURT: Ladies and gentlemen, it has been suggested that there is talk among yourselves as you wait in the witness room about the death of [the victim] and whatever you might think about that. Do you understand that you people will be called by the State, apparently, you are all State witnesses?
"(All parties answered affirmatively.)
"THE COURT: And that you have to come in and testify accurately to the questions and that your answers shall not in any way, shape or form reflect what someone else might have told you. Thus your answer would be infected and it wouldn't be the truth. You have to answer the questions specifically. In other words, you can't borrow what someone else might have told you, if you were asked to recall a particular event. We all understand that, don't we?
"(All parties answered affirmatively.)
"THE COURT: Now, will you all pledge when you testify that you will accurately answer the questions and you will not rely in any way on something someone else may have told you?
"(All parties answered affirmatively.)
"THE COURT: Have any of you tried to influence the others?
"(All witnesses answered negatively.)
"THE COURT: Have any of you told the others with any detail what you are going to say or expected to say in front of the jury?
"(All witnesses answered negatively.)
"THE COURT: All right. Now, this is an important instruction from the Court here. Don't discuss this case any more. We don't have enough room for everybody to have a private room. Don't talk about the case. Sit there and say nothing, or talk about the weather or basketball or whatever. But, don't discuss the Jackson case, please. Can you all abide by that instruction?
"(All witnesses answered affirmatively.)
"THE COURT: Thank you very much. You will retire. Andre, will you be my monitor in there, okay?
"[WITNESS]: Sure will." There is no indication in the record in this case that any State's witness, present in the jury room and allegedly discussing the case false testimony, diverged from the pretrial statements. The only State's witness who significantly changed her testimony at the time of trial was not in the jury room during these alleged conversations.[1] These witnesses were admonished and clearly instructed by the trial court concerning their function and duties, before the admission of any testimony by these witnesses. Because the alleged impropriety occurred before any testimony was given, and because the trial court instructed the witnesses that their testimony must not be influenced by the statements of any other witnesses, there is no indication that the appellant suffered any prejudice because of this alleged impropriety.
"`A motion for mistrial implies a miscarriage of justice and should only be granted where it is apparent that justice cannot be afforded.'" Garrett v. State, 580 So.2d 58, 60 (Ala.Cr.App.1991), quoting Dixon v. State, 476 So.2d 1236, 1240 (Ala.Cr.App.1985). "A mistrial is an extreme measure and should be denied when the prejudicial quality of the comment can be eradicated by curative instructions." Id. "`"The entry of a mistrial is not lightly to be undertaken.... [T]he entry should be only a last resort, as in cases of otherwise ineradicable prejudice."' Leverett v. State, 462 So.2d 972, 978 (Ala.Cr.App. 1984)." Beggs v. State, 568 So.2d 377, 380 (Ala.Cr.App.1990) (emphasis original).
"Moreover, a mistrial should be granted only when a `high degree of "manifest necessity"' is demonstrated, Wadsworth v. *1347 State, 439 So.2d 790, 792 (Ala.Cr.App. 1983), cert. denied, 466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984), as `[i]t specifies such fundamental error in a trial as to vitiate the result,' Diamond v. State, 363 So.2d [109] at 112 [(Ala.Cr.App.1978)] (emphasis added). `[I]t is well settled that the granting of a mistrial is within the sound discretion of the trial [judge], for he, being present, is in a much better position to determine what effect, if any, some occurrence may have upon the jury's ability to decide the defendant's fate fairly and justly.' Shadle v. State, 280 Ala. 379, 384, 194 So.2d 538, 542 (1967). Absent clear abuse, `[a]n appellate court "will not interfere with the exercise of [the trial court's] discretion...."' Wadsworth v. State, 439 So.2d at 792."
Cole v. State, 548 So.2d 1093, 1095-96 (Ala. Cr.App.1989). See also Ex parte Jefferson, 473 So.2d 1110, 1114-15 (Ala.1985), cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986).
Where a codefendant was called for jury duty and appeared on the jury venire at the defendant's trial, although he had been subpoenaed as a defense witness, no abuse of discretion was found by the trial court's denial of the appellant's motion for a mistrial. This court noted that the record indicated that the trial court "fully investigated the potentially prejudicial situation and found that the jurors had not been influenced by the presence of the codefendant." Samuels v. State, 584 So.2d 958, 961 (Ala.Cr.App.), cert. denied, 584 So.2d 963 (Ala.1991). Moreover, the trial court "thoroughly instructed the jury not to discuss the matter with anyone and to advise him if anyone attempted to communicate with them about the case." Id. This court concluded:
"The appellant has not demonstrated any prejudice that would justify the granting of a motion for a mistrial or motion for new trial. See, generally, Hand v. State, 472 So.2d 671 (Ala.Crim.App.1984), rev'd on other grounds, 472 So.2d 675 (Ala.1985) (trial court did not err in denying motion for mistrial which was based on observance of conversation between prosecution witness and two jurors during recess); Phillips v. State, 447 So.2d 1312 (Ala.Crim. App.1984), cert. denied, 471 U.S. 1019, 105 S.Ct. 2047, 85 L.Ed.2d 309 (1985) (although juror and complaining witness were seen talking during recess, there was no showing of prejudice that would justify granting of motion for mistrial); and Gaffney [v. State, 342 So.2d 403 (Ala.Cr.App.1976), cert. denied, 342 So.2d 404 (Ala.1977)] (no abuse of discretion in denying motion for new trial which was based on the observance of a conversation between the mother of the deceased victim and juror during recess)."
Id. See also Robinson v. State, 621 So.2d 389 (Ala.Cr.App.1993) (the trial court was informed by the bailiff that there was a drawing of a man with a noose around his neck on the chalkboard of the jury room; however, after the artist-juror was excused, the trial court found that the other jurors could base their decision on the evidence presented at trial). See also Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992) (fact that the foreman of the jury was a minister and the jury panel prayed together during deliberations and that certain jurors read from their Bibles in their hotel rooms, did not unduly prejudice the appellant).

XII
The appellant argues that the trial court erred by allowing the coroner to testify concerning photographs of the victim, of which the witness allegedly had no firsthand knowledge, and which were not admitted into evidence. The appellant refers to three photographs that were taken at the crime scene. The trial court had ruled that these three photographs of the victim's body would not be allowed into evidence, because the State's witnesses could sufficiently testify to the location and positioning of the body without the photographs, which were extremely gruesome.
During the coroner's testimony, the prosecutor asked the witness to describe the position of the victim's body when it was discovered, as depicted in those photographs. The coroner responded that the photographs showed the victim lying face down in "an apparent fire scene" and that the deceased's arms and legs were spread apart. The witness *1348 also testified that the photographs revealed "extensive thermal injury with a transmural burn through the left lateral chest wall and left upper lateral or side of the abdomen." The appellant first objected to this testimony when the State asked a question concerning the exact positioning of the victim's legs. The trial court responded that, if the coroner could communicate his observations to the jury, the photographs would not come into evidence. The coroner then responded to the prosecutor's question, testifying that the angle between the victim's legs was approximately 70 degrees.
The record indicates that the coroner's testimony concerning these photographs was cumulative to that of other State's witnesses. There had been testimony concerning the condition and positioning of the victim's body by witnesses who were present at the scene of the offense. Although the exact angle of the victim's legs had not been the subject of testimony, there had been previous testimony that the victim's legs were spread widely apart. Thus, the appellant was not prejudiced by this testimony. See Haney v. State, 603 So.2d 368 (Ala. Cr.App.1991), affirmed, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993) (allowing the admission of photographs of a deceased, although cumulative and possibly tending to inflame the jury). See also Coral v. State, 628 So.2d at 954 (admission of a statement was held to be merely cumulative, leaving "no reasonable doubt that the jury would have reached the same verdict, had it not heard [the witness's] testimony concerning the statement"). Moreover, it is clear that the trial court sought to cause the appellant the least amount of prejudice under the circumstances, where the photographs were clearly gruesome and the appellant had previously objected to their admission on this ground.

XIII
The appellant argues that the trial court's instruction to defense counsel to interrupt the State's direct examination of the coroner violated his rights to confront the witness. During the coroner's testimony, photographic slides were shown, to aid the jury's understanding of the coroner's testimony. The admission of these slides had been the subject of thorough discussion and argument, because of gruesome depictions of medical testing and investigation. The trial court had instructed the jury concerning the nature of the photographs and the manner in which it should view them. The court suggested that defense counsel pose any questions he might have concerning each slide as it was being shown, in order to avoid going through the slides again to return to any given slide. The trial court used this method in an effort to lessen the time that the autopsy slides would be shown to the jury, in turn to lessen any prejudicial effect, while allowing the State to present this evidence in support of its case. Defense counsel was not deprived of his right to cross-examination, and in fact questioned the witness on several of the slides. Defense counsel was not told that he could not return to one of the slides for questioning; rather this suggestion by the trial court was intended to benefit the appellant's cause.
"A party is entitled to a thorough and sifting cross-examination of the witnesses against him, § 12-21-137, Code of Alabama 1975; however, the trial court is vested with considerable control over the scope of the cross-examination, and its rulings thereon will not be reversed in the absence of a gross abuse of discretion that causes substantial injury to the objecting party. Perry v. Brakefield, 534 So.2d 602 (Ala.1988)." McMillian v. State, 594 So.2d 1253, 1261 (Ala.Cr.App.1991).
In the present case, there is no indication that the appellant's right to cross-examination was limited in any respect.

XIV
The appellant argues that the trial court erred in admitting evidence of his prior criminal activity and bad acts. Specifically, the appellant complains that during the State's case-in-chief the State introduced the testimony of two witnesses for the sole purpose of proving the appellant's bad character.
*1349 The first witness to whom the appellant refers was a police officer, who testified that he had previously interviewed the appellant when investigating a burglary that had occurred approximately one year before the instant offense. The record indicates that the burglary itself was not related to the instant offense; however, when the appellant was interviewed concerning his role in that earlier burglary, he implicated someone named "Robert, Jr." The officer testified that, pursuant to this information from the appellant, he had sought to locate someone by this name; however, his investigation turned up no one.
The appellant in both of his pretrial statements again implicated someone named "Robert, Jr." in the commission of this offense. Moreover, in his trial testimony, the appellant stated that after he left the club Robert, Jr., who he said was driving the victim's automobile, picked up the appellant, bought beer with him, and then drove him to the victim's house. Although the appellant stated that "Robert, Jr." was not present when the offense occurred, he was clearly involved in the res gestae.
Thus, the officer's testimony was probative to rebut the appellant's defense raised by his pretrial statement that Robert, Jr., committed the crime.
"On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question....
"This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be obtained from them....
"The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such as are offered to show the defendant's bad character. If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible.
"In their mental struggles to determine whether evidence of the accused's commission of another crime is admissible, for a purpose other than as tending to show guilt via bad character, the appellate courts in numerous opinions have set forth a list of the various purposes for which evidence of the accused's commission of another crime is admissible....
"An interesting question that should be recognized at this point is whether the list of purposes for which prior crimes of the accused can be introduced is fixed. The better reasoned view would appear to be that set forth by Judge McElroy in the second edition: `However, it must not be considered that such a listing of admissible purposes was intended to be exhaustive. It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.' The Supreme Court of Alabama, however, indicates that the exclusionary rule is properly stated `that there is a rule against the admissibility of evidence concerning prior offenses, but that to such rule there are well-recognized exceptions.'"
C. Gamble, McElroy's Alabama Evidence § 69.01(1) (4th ed. 1991).
Thus, the list of exceptions to the exclusionary rule is not exhaustive, and there may be amalgams thereof; the key inquiry is whether the probative value far outweighs the prejudicial effect of the introduction of these relevant collateral offenses. See Ex parte Smith, 581 So.2d 531, 534-36 (Ala.1991) (Alabama Supreme Court held that, even if the evidence of a collateral offense was admissible as an exception to the exclusionary rule, because the prejudicial effect outweighed *1350 its probative value, the collateral offense should not have been allowed into evidence).
"[N]ot only must it be determined that the other offenses are material and relevant to an issue other than the character of the accused and fall within an exception to the exclusionary rule, but the probative value must not be substantially outweighed by undue prejudice.
"`Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial affects.'
"United States v. Turquitt, 557 F.2d 464, 468-69 (5th Cir.1977) (citations omitted).
"However, it is `only when the probative value of evidence is "substantially outweighed by the danger of unfair prejudice,"... that relevant evidence should be excluded.' United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir.1982) (Emphasis in original.) `[T]he probative value of the evidence of other offenses must also be balanced against its "prejudicial nature" to determine its admissibility. "Prejudicial" is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.' State v. Daigle, 440 So.2d 230, 235 (La.Ct.App.1983).
"`Of course, "prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." State v. Hurd, Me., 360 A.2d 525, 527 n. 5 (1976), quoting McCormick, Handbook on the Law of Evidence § 185 at 439 n. 31 (2d ed. 1972).'
"State v. Forbes, 445 A.2d 8, 12 (Me.1982)."
Averette v. State, 469 So.2d 1371, 1373-74 (Ala.Cr.App.1985).
In this case, the prejudicial effect of this evidence outweighed the probative value. The evidence was clearly probative to the State's case in that it negated the appellant's defense set forth in his pretrial statements. The officer who testified concerning the prior burglary gave no specifics of the offense and merely testified that when he was investigating this prior burglary, he interviewed the appellant and, pursuant to that interview, searched for a Robert, Jr., to no avail. However, the prosecutor, in her closing argument to the jury, stated that the appellant had pleaded guilty to this offense.
Any prejudice suffered by the appellant from introduction of this officer's testimony, however, is lessened by the testimony by one of the investigating officers in this case that he had attempted to located a Robert, Jr., pursuant to the information furnished by the appellant and was unable to do so. On cross-examination of this witness, defense counsel further questioned the officer as to his attempts to locate this individual. Therefore, this evidence concerning the appellant's implicating an apparently fictitious person in a prior offense was cumulative to testimony concerning the appellant's apparently implicating the same individual in this offense.
Moreover, this evidence did not simply address the appellant's bad character, but was relevant toward the issue of identity. The appellant clearly placed the identity of the perpetrator at issue when he denied committing the offense and supplied the purported identity of the perpetrator. In a similar situation, this court has held that it was unnecessary to determine into exactly which exception a collateral crime fell into where the two offenses were not identical as to circumstances, but under the facts "the evidence admitted pertaining to the [collateral] crime was clearly relevant." Nicks v. State, *1351 521 So.2d 1018, 1028 (Ala.Cr.App.1987), affirmed, 521 So.2d 1035 (Ala.1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). In Nicks, the appellant threatened a robbery victim that "if he didn't lay down he was going to kill him like he did the man up the street." This court held that "[a]ny conduct or declaration of an accused having a relation to the offense charged, indicating a consciousness of guilt, is admissible as evidence against him." Id., citing Conley v. State, 354 So.2d 1172 (Ala.Cr.App. 1977). The court in Nicks then equated the facts in that case to those in Dockery v. State, 269 Ala. 564, 114 So.2d 394 (1959), wherein the Alabama Supreme Court held:
"`Evidence which is relevant to establish some element of the offense, or material as to some issue in the case, is not rendered inadmissible by the fact that it also tends to show another offense committed by defendant.' 269 Ala. at 568, 114 So.2d at 397 (quoting Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942)). This rule is sometimes stated to the effect that, if such evidence is admissible on general grounds, it is not rendered inadmissible by the fact that it discloses offenses other than the one with which the defendant is charged; that the test of admissibility is the connection of the facts proven with the offense charged; and that, where such evidence is relevant and tends to prove the defendant's guilt, he cannot by multiplying his crimes diminish the volume of competent evidence against him."
Nicks v. State, 521 So.2d at 1029. This court concluded that, because the defendant's identity in that case was at issue and because this statement tended to "corroborate or supplement admitted direct evidence," it was properly admitted as an exception to the general exclusionary rule. Id.
Moreover, in Perkins v. State, 580 So.2d 4 (Ala.Cr.App.1990), the State properly admitted evidence that the defendant, who was charged with murdering his second wife, had previously threatened his first wife under circumstances very similar to those surrounding the murder of his second wife. This court held:
"[T]hat evidence tends to prove an element that is at issue in the charged crime, i.e., the identity of the person who pulled the trigger. The appellant, by claiming the victim committed suicide, clearly placed the identity of the murderer at issue. Moreover, the circumstances of the previous threats mirror those in the instant case and are sufficiently `novel and peculiar' to merit the admission of the evidence pursuant to the identity exception.
"`If the evidence is not so remote as to lose its relevancy, the decision to allow or not allow evidence of collateral crimes or acts as part of the State's case-in-chief rests in the sound discretion of the trial judge. McGhee v. State, 333 So.2d 865 (Ala.Cr.App.1976); McDonald v. State, 57 Ala.App. 529, 329 So.2d 583 (1975), writ quashed, 295 Ala. 410, 329 So.2d 596 (1976), cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976).' Nicks v. State, 521 So.2d 1018, 1026 (Ala.Cr.App.1987), affirmed, 521 So.2d 1035 (Ala.1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)."
Perkins v. State, 580 So.2d at 8-9. Thus, we find no error in the admission of this testimony.
The appellant's second allegation concerning the admission of prior bad acts concerns the testimony of a State's witness who worked in the medical clinic at the Jefferson County Sheriff's Department. This witness was called to testify to when the appellant had suffered the injury that had caused his arm to be bandaged. The appellant alleges that this testimony indicated that he received this injury through some type of altercation. However, the record indicates that this witness made no suggestion as to the origin of the wound but that he merely testified to its approximate age. This testimony was relevant because the appellant had initially explained the blood present on his clothing when he was apprehended as coming from the cut on his arm, which he said he had suffered in an altercation with a gang member. This evidence was clearly relevant because it rebutted the statement by the appellant and "in some degree advanced [the] *1352 inquiry." McCormick On Evidence § 185 (3d ed. 1984).
Moreover, this evidence did not unduly prejudice the appellant, because the witness did not testify as to the source of the wound, and there was other properly admitted testimony that the appellant's arm was bandaged on the night of the offense.[2] Therefore, there was no error in the admission of this testimony. See Wilson v. State, 584 So.2d 921, 923-24 (Ala.Cr.App.1991) (this court held as properly admitted and relevant the testimony of two witnesses that they had previously seen the victim of a murder, in a bruised and battered condition, and that the victim periodically had to leave the house in which she had lived with the appellant, her husband.)

XV
The appellant argues that the trial court erred in allowing his jury to separate prior to trial. The record indicates that when the trial court informed the parties that he intended to let the jury separate on the first night of trial, in order to accommodate their making arrangements and gathering their possessions, there was no objection. Therefore, this claim must be analyzed pursuant to the plain error doctrine. Rule 45A, A.R.App.P.
The record indicates that, although the jury was allowed to separate on the night following the striking of the jury, they were fully instructed to refrain from discussing the case and to avoid any media coverage. Moreover, the record indicates that they were not sworn until the next morning when the trial commenced. Although he failed to object to this separation, the appellant now claims that the separation of the jury was without his consent, in violation of § 12-16-9, Code of Alabama 1975. However, "A jury is not required to be sequestered until its members have been selected and sworn." Bell v. State, 475 So.2d 601, 607 (Ala.Cr.App.1984), affirmed, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985) (citation omitted).
"According to § 12-16-9(a), a Defendant has the right to have the jury sequestered only during the pendency of the trial. [T]here is some authority to the effect that a member of a jury panel becomes a "juror" only after being sworn, with the result that specific rules or statutes relating to the sequestration of jurors have been held not applicable to prospective members of a jury panel.' Annot., Separation of Jury in Criminal Case Before Introduction of Evidence-Modern Cases, 72 A.L.R.3d 100, 103 (1976).
"This court in Ellington v. State, 51 Ala.App. 12, 282 So.2d 360, 363, cert. denied, 291 Ala. 778, 282 So.2d 366 (1973), defined at what point a trial commences: `A trial is deemed to begin when a jury of twelve is sworn, and charged with the prisoner, and after evidence has been given.'"
Stewart v. State, 601 So.2d 491, 500 (Ala.Cr. App.1992). (Emphasis original.) Therefore, because the jury was not allowed to separate "during the pendency of the trial," there was no error.

XVI
The appellant argues that the trial court's comments during jury selection destroyed the appellant's presumption of innocence, thereby violating his right to a fair trial. The record indicates that the appellant made no objections to the comments he now cites as error; therefore they must be analyzed pursuant to the plain error doctrine. Rule 45A, A.R.App.P.
The appellant first argues that the trial court referred to a possible plea bargain in this case in his comments to the jury. However, the record indicates that the comment cited by the appellant has been taken out of context. In fact, the trial court was instructing the jury as to its duties, pursuant to being allowed to separate after it was struck. The trial court stated:

*1353 "This is where you contract with me. Why do you go home tonight? Because we think we can work this out. Don't watch channel 42 on the TV, it may have a little segment about the case. I don't know that they will, but they might. Don't watch 42, please.
"Now, tomorrow when we get together at 9 o'clock fresh, I will swear you in as jurors."
The appellant claims that the statement made by the trial court that, "Because we think we can work this out" refers to a possible plea bargain. However, taken in context, it is clear that the trial court was referring to working out an arrangement whereby the jury could go home and gather their belongings before the commencement of the trial. In fact, the trial court continued referring to the swearing in of the jurors and commencement of the trial the next morning. Thus, this comment could not be given the meaning alleged by the appellant.
The appellant also argues that a comment made by the trial court during the selection of the jury went beyond the charge in the indictment and related facts that cannot be supported by the evidence. Specifically, he alleges that the trial court's reference to the fire improperly connected him with the offense of arson, for which he was not indicted. However, the record indicates that the trial court was discussing pretrial publicity and stated:
"... I think I better give you a little bit of background on the case before I ask you if you recall something about the case.
"I think it would be a fair statement to say that the case is concerning activities that allegedly occurred back on 4-21, April the 21st of this year at 5:40 or so in the morning at 1010 Avenue South in Ensley. Now, I believe the evidence will disclose that ... the deceased person, his remains were discovered at this location having been burned in a house fire. The State alleges and seeks to prove that [the victim] was strangled to death and that the remains were subjected to the fire that I mentioned.
"Show of hands from anyone that thinks you might know something about the case...."
Thus, the trial court was simply summarizing the circumstances of the offense to refresh the jurors' memories as to whether they had any prior knowledge of this case. There was ample evidence introduced at trial, including testimony and photographs, that the victim's body and house were intentionally burned immediately following the murder. Thus, arson was part of the res gestae of the offense. However, the trial court in no way indicated that the appellant was alleged to have committed the arson. Although the trial court stated that the State would prove that the victim's remains were subjected to the fire, the State did properly prove that the victim was eventually burned beyond recognition, along with his house and belongings, as part of the res gestae of the offense. See Issue XXIII, infra.
The record indicates that the trial court properly and completely instructed the jury on what was charged in the indictment, as well as on the presumption of innocence. Cf. Finley v. State, 606 So.2d 198 (Ala.Cr.App. 1992) (the defendant's presumption of innocence was not negated by the trial court's charge that the jury "may" consider the presumption of innocence, when the charge, viewed in its entirety, adequately instructed the jury as to this presumption).

XVII
The appellant argues that the trial court erred in admitting the testimony of two State's witnesses, whose identification of the appellant was allegedly tainted by an impermissibly suggestive pretrial photographic identification procedure. The appellant refers to the identifications of two of the witnesses who stated that he was the person they saw at the club with the victim on the night of the offense. He argues that the pretrial identification was improper because, he says, the police showed these witnesses only two photographs, both of the appellant in a jail uniform.
However, the record indicates that, when interviewed by investigating officers, *1354 these witnesses originally gave detailed descriptions of the appellant. Thereafter, on a separate occasion, they were shown photographs of the appellant and asked if this was the individual they had observed. Both witnesses responded affirmatively. At trial, both witnesses testified that they were basing their testimony concerning the appellant's identification on their observations on the night of the offense, and not on their viewing the photographs. The appellant argues, however, that one of these witnesses actually based her trial testimony on the improper photographic identification, and supports this contention by her testimony that she was certain that the appellant was the man, "[b]ecause the same day that I talked to the detective, he brought the picture, that same day. Okay? And that's the guy that was on the picture." However, following this testimony, the following transpired:
Q [PROSECUTOR]: Are you identifying [the appellant] from the same one on the picture?
"A: Correct.
"Q: Are you identifying him as being the one you saw in the bar?
"A: He was at the club and the one on the picture.
"Q: Are you sure?
"A: I'm positive.
"Q: Do you understand this is important?
"A: Uh huh.
"Q: Did you see the bandages on the guy at the passenger side of the car when you saw him in the parking lot?
"[DEFENSE COUNSEL]: Object as to leading, sir.
"THE COURT: Overruled. Did you or not?
"THE WITNESS: Yes, I did. I can't you know
"THE COURT: That is all right. It is hard to be a witness, you just have to be brief and wait for the next question.
". . . .
"Q [PROSECUTOR]: All right. When the detective brought a picture to you did he say anything about the picture before he showed it to you?
"A: No. Because he had changed clothes on the picture. He had on some
"THE COURT: Any kind of stuff about the picture
"THE WITNESS: No, he didn't.
"THE COURT: All right.
"Q: Did the pictures have bandages in it? The photograph that you saw, were there bandages in the picture?
"A: No.
"Q: You're identifying his face?
"A: Yes.
"Q: Did you actually see this man getting into [the victim's] car?
"A: Okay.
"Q: Explain that to the jury, what you actually saw.
"A: Okay. What I sawokay. [The victim] was sticking the key in the door to unlock the door for the
"Q: What door?
"A: The driver's side. Okay.
"Q: Right.
"A: And when I walked out the door I said `you gone, Star [the victim]?' He said `Yes, the Star is gone.' And when he said that the guy turned around and looked at me and I looked at him. Okay? And he had his hand on the handle to open the door to get in."
Thereafter, during the cross-examination of this witness, she testified concerning the detailed description that she gave to the investigating officer during her first interview with him. She also testified, during cross-examination, that she was "absolutely certain" that the person she saw in the club "face to face with the victim on the dance floor" was the same person that she saw standing at the passenger's door of the victim's car after leaving the club. She also testified that this was the same person that she described in detail to the investigator.
In McCorvey v. State, 642 So.2d 1351 (Ala. Cr.App.1992), an identification witness testified at trial that he had been shown two pictures by the police, both of the defendant, and stated that the pictures depicted the man he had observed as the driver of the automobile *1355 at the scene of the offense. The witness also testified in detail to the driver's appearance and actions based on his observations at the scene over a period of approximately an hour. This court found no error in the admission of this witness's identification in that her trial testimony was based on an independent recollection of the driver; furthermore, the witness's testimony was cumulative of other identifications by another witness at the scene.
"Thus, the victim clearly testified that she was identifying the appellant at trial from her independent recollection of him from the accident and not from the photographs she was shown. Any problem of suggestiveness in the photographic array at the police department, therefore, did not prejudice the appellant. `When an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is correctly received into evidence. Coleman v. State, [487 So.2d 1380 (Ala.Crim.App.1986)]; Jackson v. State, 414 So.2d 1014 (Ala.Crim.App. 1982); Matthews v. State, [401 So.2d 241 (Ala.Crim.App.1981); cert. denied, 401 So.2d 248 (Ala.1981)].' Ex parte Stout, 547 So.2d 901, 904 (Ala.1989). See also Clements v. State, 521 So.2d 1378 (Ala.Cr. App.1988). Therefore, the identification testimony by the victim was properly admitted at trial because it had a basis independent of any pre-trial photographic identification.
"Moreover, another witness to the accident testified that he could positively identify the appellant at trial as the person who had been involved in the accident. Therefore, any error in the admission of the testimony concerning the photographic array at the police department was harmless, because it was cumulative. Rule 45, A.R.App.P."
McCorvey v. State, 642 So.2d at 1353.
"`Stovall v. Denno, 388 U.S. 293 [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967), established a due process right to exclude unreliable identification testimony that results from procedures that are both unnecessarily suggestive and conducive to irreparable mistaken identification. Neil v. Biggers, 409 U.S. 188 [93 S.Ct. 375, 34 L.Ed.2d 401] (1972), established the rule that, where the witness's in-court identification arguably stems from a suggestive out-of-court identification, the question is "whether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive," 409 U.S. at 199 [93 S.Ct. at 382], and whether there was a substantial likelihood of misidentification. Manson v. Brathwaite, 432 U.S. 98 [97 S.Ct. 2243, 53 L.Ed.2d 140] (1977), held that, where a pretrial identification is obtained by a procedure that is both suggestive and unnecessary, "reliability is the linchpin in determining the admissibility of identification testimony," 432 U.S. at 114 [97 S.Ct. at 2253], and that the reliability of the identification must be weighed against the corrupting effect of the suggestive identification procedure itself. However, identification evidence derived from an unnecessarily suggestive source need not be excluded if the totality of the circumstances indicates its reliability.'
"Johnson v. State, 453 So.2d 1323, 1327 (Ala.Cr.App.1984). See also Jones v. State, 431 So.2d 1367 (Ala.Cr.App.1983). This court, quoting United States v. Briggs, 700 F.2d 408, 412 (7th Cir.), cert. denied, Schlacks v. United States, [461] U.S. [947], 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983), went on further to say in Johnson, `"It is incumbent upon a defendant to establish that the confrontation procedure in fact was suggestive prior to reaching the threshold `totality of the circumstances' test of reliability.'" 453 So.2d at 1328.
"In the instant case there is some question as to whether the pretrial identification procedures were in fact impermissibly suggestive. `Each case is to be considered on its own facts in determining whether the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' Fitchard v. State, 424 So.2d 674, 676 (Ala.Cr.App. 1982). See Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).... However, assuming that the pretrial identification procedures were in *1356 fact impermissibly suggestive, `[w]hen an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is properly admitted into evidence.' Mullis v. State, 545 So.2d 205, 209 (Ala.Cr.App.1989); see also Coleman v. State, 487 So.2d 1380 (Ala. Cr.App.1986), cert. denied, 499 U.S. 911, 111 S.Ct. 1118, 113 L.Ed.2d 227 (1991); Jackson v. State, 414 So.2d 1014 (Ala.Cr. App.1982); Matthews v. State, 401 So.2d 241 (Ala.Cr.App.1981), cert. denied, 401 So.2d 248 (Ala.1981). The identification is correctly received into evidence when it `stems from an independent source rather than the photographic lineup.' Hutchinson v. State, 516 So.2d 889, 893 (Ala.Cr. App.1983). `Reliability is the linchpin in determining the admissibility of identification testimony.' Mullis, 545 So.2d at 209."
Jenkins v. State, 627 So.2d 1034, 1046-47 (Ala.Cr.App.1992), affirmed, 627 So.2d 1054 (Ala.1993).
Even if the pretrial photographic identification by the witness in this case was gained by impermissibly suggestive means, her trial testimony was clearly based on independent recollection of the appellant and the events on the night of the murder. Moreover, most of her testimony was cumulative of another witness at the scene, who, as previously noted, clearly indicated that her identification was based on her observation on the night in question.

XVIII
The appellant argues that the trial court erred in admitting testimony from an allegedly incompetent lay witness, thereby violating his constitutional rights. Specifically, the appellant refers to the testimony of one of the State's witnesses, who identified the appellant as having been present at the club, and testified about the nature of the keloidal condition of the appellant's skin. The appellant argues that, because this witness has no medical background, she was not qualified to so testify.
The record indicates that three of the witnesses who observed the appellant at the club on the night in question testified that they observed lumps or keloids visible around the appellant's upper chest area, over the neckline of his shirt. All of these witnesses, on cross-examination, attempted to describe the size and condition of these lumps, pursuant to defense counsel's questions. The last of these three witnesses to testify stated, when asked on direct questioning whether she knew what a keloid was: "[I]t's a lump in the skin. It can be any part of the body, but more commonly known for people who have pierced ears and have very sensitive skin and have lumps to grow on their ears, that's called keloid." She then testified that she had noticed keloids in the appellant's chest area and described their size as being approximately that of a quarter. Defense counsel then began his cross-examination of this witness by further questioning her about these keloids, as to their number and exact positioning. He then questioned her as to whether they were flat or protruded. The witness responded that, during her observation of the appellant, he had danced and, due to the perspiration on his t-shirt, the shirt had clung to his skin and "you could see like the impression of it through the shirt." The defense counsel then asked the witness, "And to your knowledge are the keloids temporary or are they permanent type like for a better word, fixtures on the body?" The following then transpired:
"A: It would depend
"[PROSECUTOR]: We object to her expertise on keloids.
"[DEFENSE COUNSEL]: She has already led into that
"THE COURT: I know it. Do you know if keloids are permanent or can they be temporary?
"THE WITNESS: It depends on the situation. I know several people who had them. Some people get them in reaction to, allergic to chocolates, for instance. I know someone who is allergic to chocolates.
"THE COURT: I see.
"THE WITNESS: If they eat a lot of chocolates, they will rise. If they stay away from chocolates for a while, they will go away. So, it is not necessarily permanent, it can come and go.

*1357 "Q [DEFENSE COUNSEL]: Some are and some aren't?
"A: That's right. But if they are on your ears they don't just disappear, you have to have like surgery to have them removed. It depends on the situation."
Defense counsel then continued to question the witness concerning the nature of the keloids she had observed on the appellant.
The appellant did not object at trial; therefore any error must be analyzed pursuant to the plain error doctrine, enunciated in Rule 45A, A.R.App.P. Moreover, much of the testimony of which the appellant now complains was elicited during his questioning of this witness, and was thus invited. The prosecutor also objected on this ground at trial, based on the extent and nature of defense counsel's questioning.
No questions were asked of this witness that superseded the knowledge or observation of an ordinary witness. See, generally, Bailey v. State, 574 So.2d 1001, 1002-03 (Ala. Cr.App.1990) (for discussion on what constitutes an expert and the matters to which an expert testifies).
"We recognize that `a witness need not be an expert, in the technical sense, to give testimony as to things which he knows by study, practice, experience, or observation on that particular subject.' Paragon Engineering, Inc. v. Rhodes, 451 So.2d 274, 276 (Ala.1984). `Experience and practical knowledge may qualify one to make technical judgments as readily as formal education.' International Telecommunications Systems v. State of Alabama, 359 So.2d 364, 368 (Ala.1978)."
Bowden v. State, [Ms. 91-838, August 18, 1992] 610 So.2d 1256 (Ala.Cr.App.1992). Thus, a lay witness has been allowed to testify as to apparent physical conditions of another in a number of respects. Specifically, lay witnesses have been allowed to testify as to whether another appeared to be able to walk alone, that the wrist of another looked like the bone had slipped off the joint, that another seemed to be crippled, that another looked paler than usual, that another looked or appeared to be sick, that another appeared to be very weak, and that another appeared perfectly well and normal. See C. Gamble, McElroy's Alabama Evidence § 128.10(3) (4th ed. 1991). See also McElroy's, § 128.10(2) (a lay witness may testify that another was diseased, that a convulsion in another person is the same kind as the previous convulsion, that another was running a fever, that another had lost flesh, that another was perspiring freely or had sweats, that another had wrenched his back, as to whether another was permanently injured, and as to the nature of another's wounds.)
The record indicates that the witness properly testified to matters within her personal knowledge or observations. Cf. Ellis v. State, 570 So.2d 744, 757 (Ala.Cr.App.1990) (and cases therein, for the proposition that a lay witness may testify to another's sanity, as long as she has had sufficient opportunity to form an opinion regarding the individual's mental state).

XIX
The appellant argues that the trial court erred in admitting a State witness's testimony concerning the estimated time of the commencement of the fire. Specifically, the appellant argues that this witness's testimony was based on hearsay and that it was improperly based on her independent investigation.
The record indicates that the witness to whom the appellant refers was the victim's nextdoor neighbor. She testified that, prior to the day of the offense, she had telephoned the Home Box Office channel in New York and had received a letter in response, in order to ascertain the exact time at which a movie that she wished to tape, began. The witness worked for a local cable company and, therefore, had access to the channel's telephone number. Pursuant to the information she had received, she had set her video recorder and was able to gauge the approximate time of the events that transpired while the movie was being run. Specifically, she testified that the movie began at 4:10 a.m., and that she was awakened by the smell of smoke approximately 15 minutes after the movie began. She fell back asleep, but was again awakened by the smell of smoke at about 4:55, and got up to investigate. She *1358 testified that there was a great deal of smoke in her house and that she was concerned that something in her home was on fire. She observed what was transpiring in the movie as she passed the television set and, after looking outside, observed the victim's house in flames. She then telephoned the operator for the fire department. The witness testified, during direct examination, as to exactly what she saw portrayed in the movie just before she observed the victim's house in flames. She then stated that she had replayed the movie just before the trial and determined that that scene occurred approximately 60 minutes into the movie. During cross-examination, the defense counsel again questioned the witness concerning this replaying of the movie; however, no objections were made. Rule 45A, A.R.App.P.
"[I]n order to testify to certain facts, the witness must have had an opportunity to observe the facts to which he testifies and have actually observed them. Stated differently, the trial courts of Alabama have no duty to admit testimony of a witness about a matter unless it first appears that the witness has knowledge of such matter."
C. Gamble, McElroy's Alabama Evidence § 105.01 (4th ed. 1991). Thus, a witness must testify only to matters of which he has first-hand knowledge, or matters within his personal knowledge. "In laying this foundation of knowledge, it is permissible for the calling party to question the witness about the particular circumstances which led him to notice or observe or remember the fact to which he testifies. As tending to show the reason for, and the intensity of, a witness' observation of an occurrence to which he has testified, the party who called him has the right ordinarily to have him testify on direct examination to any happening at the time of the occurrence which naturally directed his attention to the occurrence and tended to impress it on his memory." McElroy's, § 105.02. Furthermore, "[a] party may elicit from his own witness, as tending to show the strength of the witness' recollection about the occurrence to which he has testified, the simple fact that, subsequent to the occurrence, he had a conversation or discussion about the occurrence." Id.
In the present case, the time at which the movie began was within the personal knowledge of the witness at the time of the offense, and caused her to have firsthand knowledge at to the approximate time at which she detected the smoke. The testimony that she played back the tape to determine the exact time that she awoke on the second occasion and observed the fire, tended to strengthen her approximation as to the time this occurred. Even if this latter testimony was improper, it clearly did not rise to the level of plain error, so that the appellant's substantial rights were or probably were injuriously affected.

XX
The appellant argues that the photographs[3] of the victim's autopsy should not have been allowed into evidence, because they served no probative value and were highly prejudicial to the appellant. Specifically, the appellant refers to the coroner's testimony concerning his findings and the nature of the victim's wounds, in which he made use of a series of photographic slides taken during the autopsy. The record indicates that the trial court voiced a great deal of concern about the potential inflammatory nature of these slides, and refused to allow some of them into evidence.
The slides that were shown to the jury illustrated the coroner's testimony and helped demonstrate his findings of hemorrhage and damage to the muscle tissue, which he stated were consistent with trauma or blows. This evidence was necessary to support the State's prima facie showing of robbery, in that it depicted the effects of force and the resultant physical injury. The slides also depicted the finger-shaped bruises and other damage to the victim's neck area, which led to the coroner's conclusion that the victim had been manually strangled. In light of the appellant's testimony at trial that the victim was strangled with a necktie, which the coroner's testimony refuted, this evidence was relevant toward the intentional murder *1359 component of the capital murder charge. Cf. Smith v. State, 588 So.2d at 580 (photographs from the autopsy were relevant toward the question of whether different knives were used to rebut the defendant's suggestion that he had left the victim alive and that someone else had killed her with another knife).
"`[P]hotographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters.' Ex parte Siebert, 555 So.2d 780, 783 (Ala.1989), cert. denied, [497 U.S. 1032] 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). `[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert at 784. See also Ex parte Bankhead. We find no error in the trial court's admission of the photographs at the guilt phase of the trial. See, e.g., Smith v. State, 581 So.2d 497 (Ala. Crim.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991) (photographs of victim's decomposed and bloated body properly admitted); Dabbs v. State, 518 So.2d 825 (Ala.Crim.App.1987) (photographs of victim's head injuries taken during autopsy were gruesome but necessary to demonstrate extent of injuries); Hamilton v. State, 492 So.2d 331 (Ala.Crim.App. 1986) (photograph of deceased's exposed scalp properly admitted into evidence)."
Johnson v. State, 620 So.2d 679, 692 (Ala.Cr. App.1992), reversed on other grounds, 620 So.2d 709 (Ala.1993).
"Photographs are admissible into evidence within the discretion of the trial judge and will be reviewed on appeal only to determine if there has been an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973)." Ex parte Bankhead, 585 So.2d 112, 118 (Ala.1991). In the present case, the slides were relevant and helped illustrate the coroner's testimony. "They did not distort the facts or mislead the jury in any way. See, Goffer v. State, 430 So.2d 896 (Ala.Cr. App.1983)." Ex parte Bankhead, supra at 118.

XXI
The appellant argues that the State failed to carry its burden of proof concerning the underlying felony of robbery. Specifically, he argues that, because, he says, the only evidence by the State to support the robbery was his possession of the victim's property, the State failed to exclude every reasonable hypothesis except that of his guilt. The appellant argues that because the State did not prove that he had any intent to take the property in connection with the killing, and because a robbery that does not occur until after the murder cannot support a charge of capital murder, the State failed to meet its burden of proof.
It is clear that intent to commit an offense is a matter that must often by proved by circumstantial evidence. See Johnson v. State, 611 So.2d 506 (Ala.Cr.App.1992); Rhodes v. State, 580 So.2d 92 (Ala.Cr.App. 1991); Hughley v. State, 574 So.2d 991 (Ala. Cr.App.1990). "A verdict of conviction will not be set aside on the grounds of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that the guilty verdict returned against the accused was wrong and unjust." Brownlee v. State, 545 So.2d 151, 162 (Ala.Cr. App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
"Circumstantial evidence will support a conviction as stoutly as direct evidence as long as such evidence indicates the appellant's guilt. Agee v. State, 470 So.2d 1331, 1332 (Ala.Cr.App.1985). Moreover, where sufficiency of the evidence is at issue, this court must view the evidence in the light most favorable to the State. Gossett v. State, 451 So.2d 437, 439 (Ala.Cr.App. 1984). The question of sufficiency of the evidence was properly submitted to the jury and this court will not substitute its judgment for that of the jury. Stone v. State, 501 So.2d 562, 656 [566] (Ala.Cr.App. 1986), overruled on other grounds, Ex parte Boyd, 542 So.2d 1276 (Ala.1989), *1360 cert. denied, [493] U.S. [883], 110 S.Ct. 219, 107 L.Ed.2d 172 (1989)."
Hughley v. State, supra at 993.
Thus, in Bufford v. State, 382 So.2d 1162, 1170-71 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980), this court held that the jury could have reasonably inferred from the facts that the defendant was found in possession of a large amount of money and the victim's vehicle in another county that the defendant determined to rob and kill the victim.
The evidence presented by the State, as set out in the statement of facts, clearly indicates that a jury question was presented and there was sufficient evidence from which the jury could reasonably infer that the appellant intended to rob the victim when he committed the murder. White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), affirmed, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).

XXII
The appellant argues that the State's rebuttal evidence was insufficient to refute his alibi. The appellant argues that this rebuttal evidence was "misleading, insufficient, and unreliable", in that the officer could testify only that an individual named Anthony Shuford was in jail at the time of the murder, but not that this was the same Anthony Shuford whose presence at the crime scene the appellant had testified to. Moreover, the officer did not testify that he himself knew that Anthony Shuford was in prison on the night of the murder.
The appellant's trial testimony indicated that a Tony Shuford, or Anthony Shuford, was the individual who actually killed the victim. He testified that Shuford had been released from prison just before the offense. The State then presented rebuttal evidence through testimony that this name and variations thereof had been run through the national crime information computer service, and that the only Anthony Shuford listed within the prison system had been convicted in 1988 and was still confined in prison. This individual was determined to have lived in the Ensley-Pratt City area, which is the area involved in this case, prior to having been convicted. This evidence was properly admitted and its weight and credibility were matters for the jury's determination. See e.g., Hilliard v. State, 610 So.2d 1204 (Ala.Cr.App.1992).

XXIII
The appellant argues that the trial court erred in admitting evidence suggesting that he was responsible for the burning of the victim's house. The appellant argues that, because he was not charged with arson, the admission of evidence that "suggested" that he was connected with the arson was improper and highly prejudicial.
However, the facts and circumstances of this case indicate that the mention of the arson was unavoidable, because the victim's body was discovered in a badly charred condition within his burned house. Moreover, the house was discovered burning by a neighbor, some time after 4:00 a.m., and the victim had last been seen alive by witnesses leaving the club around 3:00 a.m. Therefore, the evidence indicates that the murder and arson must have occurred within a short period. Where two offenses are inextricably interwoven, they are said to be part of the res gestae. Smith v. State, 588 So.2d 561 (Ala. Cr.App.1991).
"Generally, prior crimes or bad acts of an accused not charged in the indictment are not admissible if the only probative function of such evidence is to show the accused's bad character. Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983) (quoting C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (3d ed. 1977)). However, crimes or bad acts of the accused are admissible when such crimes are `inseparably connected with' or are part of the res gestae of the now charged crime. Smoot v. State, 381 So.2d 668, 671 (Ala.Cr.App.1980), C. Gamble, McElroy's Alabama Evidence § 69.01(3) (4d ed. 1991)."
King v. State, 595 So.2d 539, 541 (Ala.Cr. App.1991) (the defendant's use of force, threats, and assaults on hostages occurred contemporaneously with the charge of kidnapping). See also Harvey v. State, 579 So.2d 22, 25 (Ala.Cr.App.1990) (State's evidence indicated that the injuries suffered by *1361 the victim and her 3-year old brother occurred within 24 to 36 hours of each other and were thus part of one continuous transaction.)
"In the present case, this evidence `was intimately connected with the same transaction which is the basis of the State's case.... The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.' Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987) and cases cited therein. `The trial court did not err in overruling appellant's objection to the admission of such evidence. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which the defendant is now charged.' Coleman v. State, 487 So.2d 1380, 1385 (Ala.Cr.App.1986) and cases cited therein."
Rowell v. State, 570 So.2d 848, 852 (Ala.Cr. App.1990).
In Nichols v. State, 624 So.2d 1328 (Ala.Cr. App.1992), the defendant argued that the State improperly introduced evidence of certain property taken from the deceased that was not included within the list of property alleged in the indictment to have been taken. However, this court concluded that the other items were admissible, because they were both relevant and taken as part of the res gestae of the offense. 624 So.2d at 1338, citing Welborn v. State, 580 So.2d 1 (Ala.Cr. App.1989) (evidence of the defendant's possession of forged checks, other than those named in the indictment, was admissible to prove intent); Lane v. State, 564 So.2d 90 (Ala.Cr.App.1990) (evidence of collateral criminal activity was admissible when the event was part of one continuous transaction); Wright v. State, 574 So.2d 1031 (Ala. Cr.App.1990) (evidence that defendant's wife was also arrested and charged with a difference offense was admissible as part of the res gestae); Dority v. State, 586 So.2d 973 (Ala.Cr.App.1991) (marijuana, guns, and crack cocaine subsequently found were admissible in a trafficking case as part of the res gestae).
Because the arson was relevant in the present case and admissible as part of the res gestae, there was no error in the admission of this evidence.

XXIV
The appellant argues that his constitutional rights were violated by the State's failure to disclose certain exculpatory evidence prior to trial. The appellant refers to a statement made by a 15-year-old girl, who had been present at the scene of the crime. She had originally told the police that she had seen a tall man dressed all in black at the victim's house on the night of the murder. The appellant argues that this evidence is exculpatory, because he was wearing blue jeans and a white sweatshirt on that night. He argues that he was unaware of this statement prior to trial.
The record indicates that when this witness took the stand at trial, she testified that she had given the police false information before the trial. She testified that she lied concerning her previous statement that she had seen someone dressed in black with the victim prior to his murder. She testified that she had seen the victim earlier that evening with certain friends,[4] but had not seen a man in black. Thereafter, defense counsel questioned the witness extensively concerning her prior false statement, and her reasons for lying to the officer. Also during his cross-examination, defense counsel questioned the witness concerning her statements to a private investigator who had been sent from defense counsel's office. Defense counsel indicated in his questions that this witness had told his detective some of the same false information. Furthermore, defense counsel clearly had access to the prior statement during his questioning, because he quoted extensively from that statement. The appellant never objected on this ground at trial, and raises this matter for the first time on appeal. Therefore, any error must rise to the level of "plain error." Rule 45A, A.R.App.P.
*1362 Although the appellant argues that the State failed to disclose this prior statement and that he did not have access to the statement prior to trial, a reading of the record indicates otherwise. Before trial, the prosecutor implied that she was opening her files to the appellant, and there was no indication that defense counsel had any trouble gaining access to any information. Thus, "there has been no showing that this information was not available to the defense at the time of trial. There is no Brady violation where the information in question could have been obtained by the defense through its own efforts. May v. Collins, 904 F.2d 228, 231 (5th Cir.1990), cert. denied, 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1992)." Johnson v. State, 612 So.2d 1288 (Ala.Cr. App.1992).
Moreover, even if the appellant had not been given this statement, it is clear from his cross-examination of the witness, that he had the statement at the time of trial.
"In Coral v. State, [Ms. CR-89-1117, March 27, 1992] [628] So.2d [954] (Ala.Cr. App.1992), this Court held:
"`In Brady v. Maryland, 373 U.S. [83] at 87[, 83 S.Ct. 1194, at 1196-97, 10 L.Ed.2d 215 (1963)], the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a Brady violation, defendant must show that (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defendant or was exculpatory, and (3) the evidence suppressed was material to the issues at trial. Ex parte Kennedy, 472 So.2d 1106 (Ala.1985), cert. denied, 474 U.S. 975 [106 S.Ct. 340, 88 L.Ed.2d 325] (1985). "Materiality" requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. A "reasonable probability" is one sufficient to undermine confidence in the result. Pennsylvania v. Ritchie, 480 U.S. 39 [107 S.Ct. 989, 94 L.Ed.2d 40] (1987); United States v. Bagley, 473 U.S. 667 [105 S.Ct. 3375, 87 L.Ed.2d 481] (1985); United States v. Burroughs, 830 F.2d 1574 (11th Cir.1987), cert. denied, Rogers v. United States, 485 U.S. 969 [108 S.Ct. 1243, 99 L.Ed.2d 442 (1988); Ex parte Dickerson, 517 So.2d 628 (Ala. 1987); Thompson v. State, 581 So.2d 1216 (Ala.Cr.App.1991).
"`Tardy disclosure of Brady material is generally not reversible error unless the defendant can show that he was denied a fair trial. United States v. Gordon, 844 F.2d 1397 (9th Cir.1988); United States v. Shelton, 588 F.2d 1242 (9th Cir.1978), cert. denied, 442 U.S. 909 [99 S.Ct. 2822, 61 L.Ed.2d 275] (1979); Ex parte Raines, 429 So.2d 1111 (Ala. 1982), cert. denied, 460 U.S. 1103 [103 S.Ct. 1804, 76 L.Ed.2d 368] (1983); McClain v. State, 473 So.2d 612 (Ala.Cr. App.1985). A delay in disclosing Brady material requires reversal only if "the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." United States v. Shelton, 588 F.2d at 1247 (quoting United States v. Miller, 529 F.2d 1125, 1128 (9th Cir.), cert. denied, 426 U.S. 924 [96 S.Ct. 2634, 49 L.Ed.2d 379] (1976)).'
"Here, there is no probability that the jury would have resolved the appellant's case differently had the State disclosed the oral statement on a timely basis. Here, as in Coral, `[t]he untimely disclosure could not have had any effect whatsoever on the outcome of the case.'"
DeBruce v. State, 651 So.2d 599, 622 (Ala.Cr. App.1993).
In Hagood v. State, 588 So.2d 526, 533-34 (Ala.Cr.App.1991), cert. denied, 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992), the defendant alleged that the prosecutor suppressed exculpatory evidence, in failing to disclose a witness's expected testimony, which differed from the pretrial statements furnished to defense counsel. The prosecutor stated that he had informed defense counsel about the witness's statement the *1363 morning after he had received it. Thus, this court, citing Curry v. State, 502 So.2d 836 (Ala.Cr.App.1986) found no error. "`The appellants have failed to show how they were harmed by the delayed disclosure of the information.' Shearer v. State, 579 So.2d 692 (Ala.Cr.App.1991)." Id. See also Wright v. State, 593 So.2d 111, 115-16 (Ala.Cr.App. 1991), cert. denied, 506 U.S. 844, 113 S.Ct. 132, 121 L.Ed.2d 86 (1992) (wherein, despite the defendant's claims, his counsel was aware of the ballistics evidence and made use of the evidence at trial; further, certain evidence was obtainable as it had been a matter of public record prior to the defendant's trial).
In the present case, the appellant clearly had access to this statement at the time of trial and, especially in light of the recanting of this pretrial statement by the witness, the appellant has shown no prejudice on this ground.

XXV
In accordance with § 13A-5-53, Code of Alabama 1975, we have reviewed the record, including the guilt and sentencing proceedings, for any error that adversely affected the rights of the appellant, and we have found none. However, pursuant to our search for plain error, this court notes the following discussions that occurred during trial, concerning the reasons for jury strikes, given by both the prosecutor and the defendant.
Following the striking of the jury, the trial court specifically asked defense counsel if he wished to make any objections pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and defense counsel responded that he did not. Therefore, the record contains no further discussion on this matter until the parties reconvened for the trial court's entry of the appellant's sentence, following the second sentencing hearing before the trial court. At that time, the appellant asked that the entry of sentence be postponed until his mother could be present. The following then transpired:
"THE COURT: [Defense Counsel], we will continue it over until next Friday at eleven o'clock. [Defense Counsel], at the trial of the case I made a bench note that the net venire, after strikes for cause, consisted of forty-two venirepersons, ten blacks, two females, eight males.
"The defendant [who is black] struck five black males and one black female for a total of six strikes of black venirepersons. And then I made a note that the State struck three black males and one black female. And I went on and I made this note, two of the black males knew [Defense Counsel] and the third black male had problems with the death penalty. I didn't have anything about the black female other than she was a nurse.
"I say `Defense Counsel states on record, does not wish to make a Batson-type motion.'
"Well, since the litigation in November, these notes were made on 11-12-91, we have the Lemley case from the Court of Criminal Appeals.... And I guess we all know the question of whether the defense lawyer has to, under some circumstances, explain these strikes of minorities or blacks is now before the Supreme Court.
"Would you please state what you told us off the record? I don't think this was on the record.
"[DEFENSE COUNSEL]: No, sir.
"THE COURT: Why did you strike the black folks off of the jury, the five black males and one black female?
"[DEFENSE COUNSEL]: One, sir, had to do with the homosexuality of the deceased.
"The second reason had to do with the homosexuality of approximately three to four of the State's witnesses. And I felt as if blacks would be more opposed and more offended by listening to the testimony concerning homosexuals and may weigh heavily against my client.
"THE COURT: Guilt and punishment?
"[DEFENSE COUNSEL]: Guilt phase and punishment.
"THE COURT: You thought blacks would be harder on your man in the guilt phase and then separately and severally in the punishment phase should you get there?
"[DEFENSE COUNSEL]: Yes, sir.

*1364 "THE COURT: Does your client admit to homosexuality in the case?
"[DEFENSE COUNSEL]: No, sir.
"THE COURT: I think he stated in his testimony in the guilt phase that he and the deceased were discussing a sexual encounter and ended up being in an argument.
"[DEFENSE COUNSEL]: Yes, sir.
". . . .
"[DEFENSE COUNSEL]: The other problem with the case is the fact that we felt as if, and it did occur, the testimony would show my client lived with several other homosexuals.
"THE COURT: That's right.
"[DEFENSE COUNSEL]: And we thought that would be detrimental to the case. The other reasons was because of certain statements we received from the District Attorney's Office that indicated my client used several derogatory words towards other blacks and we felt if blacks were to hear that, that would weigh heavily in the guilt-punishment phase of my client.[5]
"THE COURT: Yes. The young man in the housing project and that was in the car and jumped out and attributed to your client some racial epithets.
"[DEFENSE COUNSEL]: Yes, sir.
"THE COURT: I appreciate you making those disclosures, I thought they should be on the record. Who knows the state of the law next week. So, I appreciate you making those comments.
". . . .
"[DEFENSE COUNSEL]: I would like to make one last comment, sir. There were discussions of Mr. Jackson concerning how we were to going to [sic] use our strikes.
"THE COURT: Did he concur in your analysis?
"MR. JAMES KENNETH JACKSON: Yes, sir.
"[DEFENSE COUNSEL]: Yes, sir. And which ones we wanted to stay on the jury and which ones we did not. And we discussed the reason for each of our potential strikes.
"THE COURT: Do you agree that three of the blacks they [the State] struck, two of them knew you?
"[DEFENSE COUNSEL]: Yes, sir.
"THE COURT: That's unusual. And somebody had a problem with the death penalty. I didn't make very copious notes about it. But, I didn't want to make the mistake, if you thought I was wrong, I wanted you to tell me.
"[DEFENSE COUNSEL]: No, sir.
"THE COURT: One guy had a problem with the death penalty and two knew you. I don't remember anything about the female other than she was a nurse. Thank you for coming...."
Thus, the record indicates that the reasons given by the appellant, who is black, for his strikes were clearly racially motivated. Specifically, he struck blacks because he believed blacks tended to be more opposed to homosexuals and would be angered by the testimony concerning his reference to the victim as a "nigger."
In Lemley v. State, 599 So.2d 64 (Ala.Cr. App.1992), this court held that the principles of Batson v. Kentucky, apply to strikes of black veniremembers by defense counsel and that a trial court may determine whether a prima facie case of discrimination exists by these strikes, despite the State's failure to object. In Lemley, the defendant had argued that it was improper for the trial court to have made such findings and to have restored certain veniremembers pursuant to these findings.
In the present case, the appellant entered no objection concerning this matter; therefore, any error must rise to the level of "plain error," i.e., the error "has or probably has adversely affected the substantial right of the appellant." Rule 45A, A.R.App.P. "`Plain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Bush v. State, 523 So.2d 538, 560 (Ala.Cr.App.1988) (and cases cited therein). *1365 In this case, it is clear that this error did not adversely affect the substantial rights of the appellant, because his actions and reasoned choices are in question.
Moreover, although the State's suggested reasons for entering its strikes appear in the record, except for the reason for striking the female black nurse, Cf. Ex parte Jackson, 640 So.2d 1050 (Ala.1993) (failure of even one reason for a prosecutor's strikes to appear in the record constitutes plain error), these reasons were not supplied by the prosecutor, and the appellant affirmatively acknowledged that he had no objections to any of the prosecutor's strikes. Therefore, under these circumstances, the fact that the reason for the strike of the black female nurse does not appear in the record does not constitute plain error.
Having found no plain error in this case, we further find no evidence that the sentence was imposed under influence of passion, prejudice, or any other arbitrary factor.
The trial court properly found the existence of one aggravating circumstance: that the capital offense was committed during a robbery. The trial court properly found the existence of one statutory mitigating circumstance: the age of the appellant at the time of the crime, which was 22 years. Furthermore, the trial court properly found the existence of no nonstatutory mitigating circumstances.
After an independent weighing of the aggravating and mitigating circumstances in this case, we find the evidence supports the trial court's conclusion and indicates that death was the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendant. Fully two-thirds of the Alabama death sentences are imposed for the capital offense of robbery/murder. Kuenzel v. State, 577 So.2d 474, 530 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); McWilliams v. State, 640 So.2d 982 (Ala.Cr. App.1991), affirmed in part and remanded in part, 640 So.2d 1015 (Ala.1993).
Because the appellant's conviction and sentence of death are proper, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
NOTES
[1] The transcript lists the witnesses who were present in the witness room and were admonished by the trial court, and the State's witness who drastically changed her testimony was not among them.
[2] The appellant's first statement indicated that he received this wound during knife fight with a gang member. The appellant's first statement was admitted into evidence; however, portions of the statement were deleted before it was made accessible to the jury. It is unclear from the record what portions were deleted; therefore, it is unclear whether this evidence was before the jury.
[3] It appears that there may have been photographs that replicated the slides. But the appellant's argument clearly refers to the slide presentation.
[4] There was testimony at trial as to the victim's activities earlier in the day, which included his associating with these individuals. This information was known by both parties.
[5] There was testimony introduced at trial that, after the offense, the appellant drove to the project, where he made the statement that he had just shot or killed "a nigger."